[Cite as *Durben v. Malek*, 2014-Ohio-2611.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| ANITA DURBEN, et al. | JUDGES:<br>Hon. W. Scott Gwin, P. J. |
| Plaintiffs-Appellants | Hon. John W. Wise, J.<br>Hon. Patricia A. Delaney, J. |
| -vs- | |
| | Case No. 2013 AP 08 0032 |
| ROXANNE MALEK | |
| Defendant-Appellee | O P I N I O N |


| | |
|---|---|
| CHARACTER OF PROCEEDING: | Civil Appeal from the Court of Common Pleas, Case No. 2012CV010072 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | June 17, 2014 |


APPEARANCES:

For Plaintiffs-Appellants

BRETT H. HILLYER
201 North Main Street, P.O. Box 272
Uhrichsville, Ohio  44683

For Defendant-Appellee

DAVID C. HIPP
300 East High Avenue, P.O. Box 90
New Philadelphia, Ohio  44663

*Wise, J.*

**{¶1}** Plaintiffs-Appellants appeal the July 5, 2013, decision of the Tuscarawas County Court of Common Pleas finding judgment in favor of Defendant-Appellee Roxanne Malek following a bench trial on Plaintiffs-Appellants' claims of conversion and replevin and Defendant-Appellee's counter-claims of waste and conversion.

## STATEMENT OF THE FACTS AND CASE

**{¶2}** In 1995, Plaintiffs-Appellants Anita and Bill (George) Durben purchased certain real estate on Keiser Hill Road from the estate of Anita's parents. The property consists of approximately 130 acres with a house and outbuildings.

**{¶3}** Subsequently, the Durbens began to experience serious financial problems related to Mrs. Durben's physical and mental health issues. (T. at 197). Mrs. Durben had accumulated credit card balances of approximately $30,000.00 due in part to extensive purchases from various cable TV shopping channels. (T. 107-108). Mrs. Durben was receiving social security income of approximately $500.00. The Durbens' mortgage was in default and they were experiencing considerable difficulty in meeting expenses.

**{¶4}** When the Durbens could no longer hold off their creditors, Defendant-Appellee Roxanne Malek, Anita's niece, and her husband Jim agreed to purchase the property for $100,000.00. This money was used to satisfy the mortgage balance of approximately $80,000.00 and provide the Durbens with approximately $20,000.00 in cash. (T. at 76, 202-203). The purchase agreement provided that the Durbens would have a life estate on 30 acres, including the house and outbuildings located on the property. By terms of the agreement, the Durbens were not to commit waste on the land

and the buyer, Roxanne Malek, would have the benefit of any leases. The Durbens would, however, continue to receive the benefit of *existing* leases.

{¶5} Even after the purchase price was paid, the Durbens continued to have serious financial problems. Roxanne Malek and her husband gave the Durbens an additional $30,000.00, $10,000.00 yearly for three years. (T. at 45, 203-204).

{¶6} When Roxanne Malek purchased the property in 2007, she did so sight unseen. She was aware of the condition of the property on or around the time the Durbens had originally acquired title. George Durben testified that beginning in 2007, Roxanne Malek and her husband would visit the property periodically. (T. at 44). After acknowledging that the condition of the property was getting worse, George Durben testified that the Maleks were going to arrange for "Mexicans" to come up and help them clean things up. (T. at 35).

{¶7} Finally, in 2009 after the Durbens had ceased residing in the house due to Health Department determinations that the property became uninhabitable, Roxanne Malek informed the Durbens that they had to clean up the property.

{¶8} When Malek took possession of the property, the furnace was not working. There was no water service because the pump had stopped working. The rooms of the house were filled with debris, sometimes piled to the ceiling. The house was littered with broken furniture, and the appliances were not working. The bathroom plumbing fixtures were inoperable and bottles of yellow fluid, believed to be urine, were scattered throughout the house. There were broken floor joists resulting from the amount and weight of the trash on the floor above. The yard was littered with broken furniture and other trash. There were inoperable vehicles on the property.

{¶9}  The trial court admitted photographs of the property showing the condition when Roxanne Malek went on to the property. (See Defendant's Trial Exhibits C, D, J-Q).

{¶10} Plaintiff George Durben agreed that the condition of the property had worsened from 2007 until 2011 because of the accumulation of trash and failure to maintain the property. (T. at 99-104).

{¶11} The Durbens moved from the house, first to a motel and then to an apartment. (T. at 46-47). However, George Durben claimed to have stayed overnight in a camper located on the property to allow him to keep an eye on the house. (T. at 49). His testimony varied from a month or two to "off and on" until 2011. He also testified that while staying in the camper, he was feeding the horses, dogs, and cats which had been left on the property. (T. at 13-15). Despite his presence on the property, there were break-ins to the home and thefts of property. (T. at 71-72).

{¶12} In October, 2011, Roxanne Malek retained counsel who notified the Durbens to vacate the property within two weeks. When the agreed upon deadline for removing property passed, Malek removed whatever items appeared to have any value and stored the items in a storage facility. (T. at 217-219). Those items were later appraised at approximately $1,098.00. (T. at 123).

{¶13} The Durbens claimed that the property which was taken by Roxanne Malek was valued in excess of $200,000.00. The Durbens claimed that there was valuable furniture on the property, including two end tables worth $100,000.00, three dressers worth $25,000.00 to $30,000.00 and jewelry valued at more than $100,000.00. (T. at 108-118, 126-162, 188-189). They further alleged that various items purchased

from the shopping channel QVC were valued at amounts into the thousands of dollars. (T. at 19-31). The Durbens acknowledged that all of the valuable property was left in the home after they vacated the property, and that they had never made any effort in two years to remove those items. The Durbens further claimed that Roxanne Malek also removed appliances, tools, guns, equipment, and valuable furniture which had been left on the property.

{¶14} After December, 2011, Roxanne Malek spent thousands of dollars in cleanup and repairs just to stabilize the house. (T. at 220-228).

{¶15} After the Malek purchase of the property, the Durbens executed a lease with another cell phone company to locate equipment on an existing tower. The Durbens received and retained the rental payments from this lease. (T. at 230-232). This lease was entered into without the knowledge of Roxanne Malek.

{¶16} On December 14, 2011, the Plaintiffs-Appellants Anita and Bill Durben filed a Complaint in the Tuscarawas County Court against the Roxanne Malek for replevin and for conversion of furniture and other property.

{¶17} Defendant-Appellee Roxanne Malek answered denying the Plaintiffs-Appellants' allegations and asserted counter-claims for damages resulting from waste committed by Plaintiffs-Appellants, nuisance, and conversion of communication antenna rentals. As Defendant-Appellee's counterclaim sought damages in a monetary amount exceeding the County Court's monetary jurisdiction, the case was transferred to the Tuscarawas County Common Pleas Court.

{¶18} Plaintiffs-Appellants subsequently filed an amended complaint to add a claim for intentional infliction of emotional harm.

{¶19} Following Defendant-Appellee's motion for partial summary judgment, the trial court entered judgment in favor of Defendant-Appellee on Plaintiffs-Appellants claim for intentional infliction of emotional harm.

{¶20} On April 25, 2013, the matter proceeded to trial before the court.

{¶21} On July 5, 2013, the trial court rendered judgment against the Plaintiffs-Appellants on their claims for conversion and replevin and in favor of the Defendant-Appellee on her claims for waste and conversion.

{¶22} Appellants now appeal, assigning the following errors for review:

**ASSIGNMENTS OF ERROR**

{¶23} "I. THE TRIAL COURT ERRED IN RULING THAT THE APPELLANT IN THIS MATTER ABANDONED THE CHATTEL PROPERTY.

{¶24} "II. THE TRIAL COURT ERRED IN RULING THAT DAMAGES WERE APPROPRIATE IN THE ABOVE CAPTIONED CASE AS THE APPELLEE WAS UNABLE TO SPECIFY THE CONDITION OF THE PROPERTY PRIOR TO TAKING OWNERSHIP.

{¶25} "III. THE TRIAL COURT ERRED IN GRANTING ANY PROCEEDS FOR CONVERSION ON THE COMMUNICATIONS TOWERS ON THE PREMISES."

**I.**

{¶26} In their First Assignment of Error, Appellants argue the trial court erred in finding that they abandoned any personal property left at or on the real property in question, and that Appellee did not convert the chattel property. We disagree.

{¶27} "Conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim

inconsistent with his rights." *State ex. rel Toma v. Corrigan* (2001), 92 Ohio St.3d 589, 592, 752 N.E.2d 281, quoting *Joyce v. General Motors Corp.* (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172.

**{¶28}** Abandoned property has been defined as "property over which the owner has relinquished all right, title, claim, and possession with the intention of not reclaiming it or resuming its ownership, possession or enjoyment." *Doughman v. Long,* 42 Ohio App.3d 17, 21, 536 N.E.2d 394 (12th Dist.1987).

**{¶29}** Here, the trial court found that Appellants abandoned any personal property remaining at or on the real property in this matter and that, consequently, Appellee is not liable for conversion. We agree.

**{¶30}** "Abandonment requires affirmative proof of the intent to abandon coupled with acts or omissions implementing the intent." *Village of New Richmond v. Painter,* 12th Dist. No CA2002-10-080, 2003-Ohio-3871 at ¶ 9, citing *Davis v. Suggs* (1983), 10 Ohio App.3d 50, 52, 460 N.E.2d 665. Intent to abandon "must be shown by unequivocal and decisive acts indicative of abandonment." *Erie Metroparks Bd. of Commrs. v. Key Trust Co. of Ohio,* 145 Ohio App.3d 782, 790, *2001-Ohio-2888* at ¶ 47 (Citations omitted). Mere non-use is not sufficient to establish the fact of abandonment, absent other evidence tending to prove the intent to abandon." *Long v. Noah's Lost Ark Inc.,* 158 Ohio App.3d 206, 814 N.E.2d 555, 2004-Ohio-4155, ¶ 35 (7th Dist.) (quoting *Davis v. Suggs,* 10 Ohio App.3d 50, 52, 460 N.E.2d 665 (12th Dist.1983)).

**{¶31}** After Appellee served Appellants with an eviction notice, Appellants, upon request, were granted two weeks to retrieve any belongings from the property. Appellants did in fact retrieve a number of personal items, leaving behind many others.

{¶32} The trial court found an intention to abandon the property. That finding is supported by some competent, credible evidence and will, therefore, not be reversed. Indeed, Appellants were given ample opportunity to remove their property. Appellants chose to leave many items behind. Because Appellants abandoned their property, Appellee did not convert the property to her own use.

{¶33} Accordingly, Appellants' First Assignment of Error is overruled.

**II.**

{¶34} In their Second Assignment of Error, Appellants argue the trial court erred in awarding damages on Appellee's counter-claim for waste. We disagree.

{¶35} "Waste has been defined as an unlawful act or omission of duty on the part of a tenant which results in a permanent injury to the real estate. Waste has been divided into two categories, to wit: voluntary and permissive. Voluntary waste is willful waste conducted by a tenant and permissive waste arises from the neglect, omission, sufferance or permission of the tenant in failing to preserve or protect the estate." *Morelli Realty v. Quik Shops Food Mart* (July 8, 1981), Stark App. No. CA-5549.

{¶36} "[I]t is the life tenant, and not the remainderman, who must preserve the property during the life estate by undertaking repairs made necessary by normal wear and tear." *Reams v. Henney* (1950), 88 Ohio App. 409, 410-414, 97 N.E.2d 37.

{¶37} In the case sub judice, the purchase agreement provides that Appellee would grant Appellants a life estate in the property subject to Appellants not committing waste upon the property,

{¶38} At trial, Appellee testified that when she purchased the property in 2007, she did so without ever having seen the interior of the house. (T. at 250). She

explained that the last time she had been inside the house was sometime in the late 1990's. (T. at 251-252).

{¶39} She went on to testify that by 2009, it was apparent that the condition of the house and premises were deteriorating:

{¶40} "There was a lot more trash, there was a deterioration of the buildings. I believe at some point the tractor in 2008 stopped working so the property wasn't being mowed or maintained, the fields were growing in excess, burrs and weeds taller than myself, fencing knocked down, a lot of trash.

{¶41} "***

{¶42} "I think the front porch. You couldn't use the front porch any longer." (T. at 207).

{¶43} More specifically, Appellee described the condition of the house in 2009:

{¶44} "Q: And would you just briefly describe the general condition of the house when you went in in 2009 at the time they were leaving?

{¶45} "A: It was – it was pretty bad. But I – I wasn't all over the house. You couldn't get to parts of the house.

{¶46} "Q: The outdoor pictures show more and more accumulation of trash. Did you notice it getting worse and worse?

{¶47} "A: Yes, yes.

{¶48} "Q: And did you have some concern about the health and well being of your aunt and uncle?

{¶49} "A: Absolutely because they didn't have heat and they didn't have any running water.

{¶50} "Q:  When you went on the property in 2009 after they left was there running water?

{¶51} "A:  No, no.

{¶52} "Q:  How was water supplied to the house?

{¶53} "A:  I believe my Uncle Bill brought bottles of water to the home." (T. at 209).

{¶54} Appellee also testified that the well pump was not working and none of the sinks or toilets were operational. (T. at 210). She testified that Appellants had been using "hospital type potty chairs." *Id.*  She further testified that the bedroom and the hallways were full of bottles and jugs containing yellow substances which she believed to be urine based on the color and the odor. (T. at 211).  She further testified that there were also bottles outside, like they had been thrown out of the windows. (T. at 212).

{¶55} Appellee testified that the floor of the living room had sunken two feet under the weight of the trash piled there.  (T. at 224). She stated that seven of the floor joists had split and the only reason the floor had not caved in was because of the coal furnace directly underneath which had managed to keep it propped up. (T. at 224, 234).

{¶56} Appellant George Durben readily admitted that the situation had gotten worse after Appellee purchased the property. (T. at 101). George Durben testified that they did nothing to prevent the condition of the property from deteriorating or worsening. (T. at 100-101). He admitted that they failed to repair the plumbing, the furnace, or anything else when it broke. *Id.* He admitted that they never cleaned the sinks or the bath tubs *Id.*  He further admitted that outside of a failed attempt trying to clean the front porch, no repairs were made to the property. (T. at 104).

**{¶57}** Appellee provided the trial court with numerous photographs which depicted the deplorable state of the residence. The trial court summarized:

**{¶58}** "The residence in question was inundated and overrun with junk and trash creating a deplorable condition, the likes of which have not been observed by the undersigned in any legal case during his thirty-two (32) years of judicial service in Tuscarawas County, Ohio.

**{¶59}** "The weight of the trash and accumulated junk items in the living room of the residence caused the floor joists to sag and fracture. The plumbing and fixtures were in disrepair and not workable. Animal feces and bottles of what appeared to be urine were located throughout the house. Broken and discarded items of furniture, other household items and miscellaneous trash items were scattered throughout the entire residence. *** ". (Judgment entry, July 5, 2013).

**{¶60}** Appellee testified that it cost approximately $30,000.00 to put the house and property back to the kind of condition it should have been in had Appellants maintained the premises. (T. at 227). She also provided the court with a spreadsheet documenting estimates she had received for repair work, including repairing the floor, remediation, cleaning, trash removal, labor, etc. (T. at 239).

**{¶61}** While Appellee admits she does not know the exact condition of the interior of the house in 2007 when she purchased it, from the above stated facts including Appellants own admissions that they did nothing to try to clean or maintain the property, it is evident that Appellants, even accounting for normal wear and tear, did not return the building to Appellee in the condition it was in when she purchased the property in 2007.

**{¶62}** Based on the foregoing, we find the record supports the trial court's judgment amount of $40,000.00 on Appellee's claim for waste.

**{¶63}** Appellants' Second Assignment of Error is overruled.

**III.**

**{¶64}** In their Third Assignment of Error, Appellants argue that the trial court erred in granting damages on Appellee's counter-claim for conversion. We disagree.

**{¶65}** The trial court found Appellant did not have the right to retain the rental receipts for the second cell tower lease Appellant entered into after the sale of the property to Roxanne Malek.

**{¶66}** A person possessing a life estate in specified property can lease the property to someone else for the duration of the life estate. *See Noble v. Tyler* (1900), 61 Ohio St. 432, 56 N.E. 191 and *Fruth v. Schulz* (May 12, 1995), Wood App. No. WD-94-052, unreported. As the court noted in *Fruth, supra.,* the power to rent is inherent in a life estate absent a specific prohibition in the granting clause of a will providing otherwise. *Douglas v. Stackhouse*, 5th Dist. Stark App. 1999CA00130.

**{¶67}** "The scope of the life tenant's power is broad. It includes a power to sell, to give away, to mortgage, or to lease the land for a period not greater than the duration of the transferor's estate. * * * Leases given by the life tenant expire on the death of the original measuring life." 2 Powell on Real Property (1994), 15-57, 15-58, Paragraph 203[3]. *See also Winters Nat'l. Bank & Trust Co. v. Shawen* (1964), 95 Ohio Law Abs. 337, 347 (life estate without power to rent constitutes tenancy at will); 1 McDermott's Ohio Real Property (4 Ed.1988) 433, 11-63A; see, generally, 41 Ohio Jurisprudence 3d (1983) 480-481, Estates, Powers, and Restraints on Alienation, Section 56.

**{¶68}** Accordingly, Appellants in this case would have received an inherent power to rent or lease the property in which they were granted a life estate which could only be defeated by specific language in the granting clause defeating that power.

**{¶69}** Here, there does exist limiting language in the purchase agreement entered into between the parties in this case on September 13, 2007, which provided:

**{¶70}** "[t]he Buyer (Appellee) shall become the owner of any leases relating to gas, minerals, and *cell towers* etc. with the Seller (Appellants) receiving the benefit of certain of the proceeds from the leases with the consent and approval of the Buyer."

**{¶71}** Evidence was presented at trial that Appellants entered into the second cell tower lease contract without the prior knowledge or consent of Appellee and that they received $1,250.00 in rental payments for said lease. (T. at 252-253). We therefore find the trial court was correct in finding that by keeping the rental receipts in contravention of the purchase contract, Appellant converted the property rightfully belonging to Appellee.

**{¶72}**  Appellants' Third Assignment of Error is overruled.

**{¶73}**  For the foregoing reasons, the judgment of the Court of Common Pleas, Tuscarawas County, Ohio, is affirmed.


By: Wise, J.

Gwin, P. J., and

Delaney, J., concur.



JWW/d 0529