[Cite as *Nichols v. Croplands, L.L.C.*, 2025-Ohio-128.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

MADISON COUNTY

| | | |
|---|---|---|
| MARVIN NICHOLS, et al., | : | |
| | | CASE NO. CA2024-02-005 |
| Appellees, | : | |
| | | O P I N I O N |
| | : | 1/21/2025 |
| - vs - | | |
| | : | |
| CROPLANDS, L.L.C., | : | |
| Appellant. | : | |

CIVIL APPEAL FROM MADISON COUNTY COURT OF COMMON PLEAS
Case No. CVH 20230086

Thomas M. McCash, for appellees.

Thompson, Dunlap & Heydinger, LTD., and Terrence G. Stolly and Connor W. Kinsey, for appellant.

**BYRNE, P.J.**

{¶ 1} Appellant, Croplands, LLC, appeals from the decision of the Madison County Court of Common Pleas, General Division, which (1) found that appellees, Marvin Nichols and Carol Nichols, possessed a life estate in certain real estate, and (2) permanently enjoined Croplands, LLC from proceeding against the Nicholses in a forcible

entry and detainer action.  For the reasons discussed below, we reverse.

## I. Factual and Procedural Background

{¶ 2}   Marvin Nichols began working for Leckie Farms, Inc. ("Leckie Farms") in the early 1980s.  At the time, Leckie Farms was operated by Fred Leckie, Sr.  Leckie Farms paid Marvin $250 a week.  As an additional element of his compensation, Leckie Farms provided Marvin and his wife Carol with residential housing located at 8175 Rosedale Milford Center Road ("the Property").[1]  Leckie Farms paid for the utilities at the Property.

{¶ 3}   In 1997, this arrangement—at least with regard to housing—was reduced to a written agreement ("the Agreement").  The terms of the Agreement were as follows:

**AGREEMENT**

**WHEREAS,** Leckie Farms, Inc. wishes to provide certain security for Marvin and Carol Nichols;

**NOW, THEREFORE,** it is agreed as follows:
So long, and no longer, as Marvin Nichols and Carol Nichols, or either of them:

(1) Reside in the residence house at 8175 Rosedale-Milford Center Road, Mechanicsburg, Ohio; and
(2) Are employed by Leckie Farms or shareholders thereof, or are retired from such employment;
(3) Maintain the house and yard area;
(4) Use same solely for their residence,

They, or either of them, in consideration of $1.00, the receipt whereof is hereby acknowledged, are granted the exclusive occupancy of said premises for so long as they comply with the terms above.

This agreement is personal to the parties and is not assignable.

**IN WITNESS WHEREOF,** the parties have affixed their

---

1. We do not consider or reach any questions regarding Marvin's compensation as those issues are not before us.

- 2 -

signatures this 11th day of March, 1997.

{¶ 4} The Agreement was executed by the Nicholses and Fred Leckie, Sr., as President of Leckie Farms.

{¶ 5} In 2009, Fred Leckie, Sr. died. Fred's son and daughter then took over operations of Leckie Farms. Marvin continued working for Leckie Farms until his medical retirement in 2010. Despite no longer working, Leckie Farms continued paying Marvin $250 a week until his social security disability benefit was approved in 2012. After 2012, the Nicholses continued to reside at the Property and Leckie Farms continued to pay for the utilities at the Property.

{¶ 6} In November 2022, Croplands purchased the farmland owned by Leckie Farms, which included the Property. Contemporaneously with their purchase, Croplands sent the Nicholses a notice that it was terminating what Croplands understood to be an oral, month-to-month lease. The Nicholses subsequently sent Croplands a copy of the Agreement.

{¶ 7} In May 2023, Croplands initiated a forcible entry and detainer ("FED") action against the Nicholses in the Madison County Municipal Court. Afterwards, the Nicholses filed a complaint against Croplands in the Madison County Court of Common Pleas. For context, we pause to note that this second case is the one now on appeal.

{¶ 8} In the common pleas court complaint, the Nicholses sought a declaratory judgment that the Agreement granted them a life estate in the Property. The Nicholses further sought an order enjoining Croplands from evicting them from the Property. The common pleas court granted the Nicholses a temporary restraining order while the dispute was pending. At some point, Croplands voluntarily dismissed its FED action in municipal court, pending resolution of the common pleas case.

{¶ 9} The common pleas court conducted an evidentiary hearing on December

4, 2023.  A representative of Croplands testified, as did Marvin Nichols.

{¶ 10} In January 2024, the common pleas court issued a journal entry in which it found the Agreement was ambiguous as to the duration of the Nicholses' right to occupy the Property.  In this regard, the common pleas court noted that "the length of the [A]greement is unknown.  It does not provide a time limit on how long [the Nicholses] may comply with the terms of the [A]greement."  On this basis, the common pleas court concluded that "the length of the [A]greement as written is ambiguous."  Based on this ambiguity, the common pleas court considered extrinsic evidence on the issue of whether the Agreement was intended to create a life estate or was instead a residential lease.  Ultimately, the court determined that the Agreement granted the Nicholses a life estate in the Property and was not subject to the provisions of R.C. Chapter 5321 (the Chapter addressing landlord and tenant law, including FED actions).  The court also granted the Nicholses' claim for a permanent injunction barring Croplands from proceeding against the Nicholses in a FED action.

{¶ 11} Croplands appealed, raising two assignments of error.

## II. Law and Analysis

### A.  Life Estate or Lease?

{¶ 12} Croplands' first assignment of error states:

> THE TRIAL COURT ERRED BY FINDING THE EXISTENCE OF A LIFE ESTATE IN FAVOR OF MARVIN NICHOLS AND CAROL NICHOLS WHERE THE TEXT OF THE INSTRUMENT ALLEGEDLY CREATING SAID INTEREST MAKES NO REFERENCE TO A LIFE ESTATE, AND EXPLICITLY DISCLAIMS THE BASIC LEGAL INCIDENTS TO A LIFE ESTATE.

{¶ 13} Croplands argues that the common pleas court erred in construing the Agreement as granting the Nicholses a life estate in the Property because the document (1) made no reference to granting property rights to the Nicholses for their lives, and (2)

- 4 -

expressly forbade the Nicholses from selling, transferring, or otherwise alienating their interest in the Property. Croplands argues that the only right conferred on the Nicholses was the right to "exclusive occupancy," so long as the conditions in the Agreement were met.

**1. Standard of Review**

{¶ 14} The Agreement is a written contract between Leckie Farms and the Nicholses. "In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which we presume rests in the language that they have chosen to employ." *In re All Kelley & Ferraro Asbestos Cases*, 2004-Ohio-7104, ¶ 29. "Where the terms of the contract are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties." *State ex rel. Lee v. Plain City*, 2017-Ohio-8931, ¶ 21 (12th Dist.), citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989). That is to say, "[a] contract that is, by its terms, clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract." *Cooper v. Chateau Estate Homes, L.L.C.*, 2010-Ohio-5186, ¶ 12 (12th Dist.).

{¶ 15} This court reviews issues of contract interpretation de novo. *Pierce Point Cinema 10, L.L.C. v. Perin-Tyler Family Found., L.L.C.*, 2012-Ohio-5008, ¶ 10 (12th Dist.).

**2. Life Estates and Rental Agreements**

{¶ 16} The issue posed to the common pleas court was whether the Agreement constituted a life estate or instead a rental agreement. The distinction was critical because if the Agreement was a rental agreement, it would be subject to the landlord/tenant laws set forth in R.C. Chapter 5321, and thus Croplands could potentially proceed with its FED action to evict the Nicholses. But if the Agreement instead concerned a life estate, then R.C. Chapter 5321 would not apply and Croplands could not

proceed with a FED action to evict the Nicholses.

{¶ 17} Pursuant to R.C. 5321.01(D), a "rental agreement" is "any agreement or lease, written or oral, which establishes or modifies the terms, conditions, rules, amount of rent charged or paid, or any other provisions concerning the use and occupancy of residential premises by one of the parties."

{¶ 18} The Fifth District Court of Appeals has described a life estate as follows:

> a life estate is a freehold estate which is held by the tenant for his own life. *See, Lape v. Lape* (1920), 22 ONP NS 392. The life tenant is entitled to full use and possession of the Property subject to the limitation that the estate of those [who] are to follow in possession not be permanently diminished in value by his/her neglecting to do that which an orderly prudent person would do in the preservation of his own property, or by doing those things which are not necessary to the full enjoyment of the particular estate and which have the effect of permanently diminishing the value of the future estate. See *Johnson v. Johnson* (1894), 51 Ohio St. 446.

*Bush v. Bush*, 1988 WL 42481, *2 (5th Dist. Apr. 27, 1988). *Accord* 41 Ohio Jur.3d Estates, Etc., § 53, 69.

{¶ 19} The "full use and possession" of the life tenant includes the right "to sell, to give away, to mortgage, or to lease the land for a period not greater than the duration" of the life tenant's life. *Fruth v. Shultz*, 1995 WL 283891, *3 (6th Dist. May 12, 1995), citing 2 *Powell on Real Property*, 15-57, 15-58, Paragraph 203[3] (1994). *Accord Sullinger v. Reed*, 2021-Ohio-2872, ¶ 21 (3d. Dist.), citing *Durben v. Malek*, 2014-Ohio-2611, ¶ 66 (5th Dist.)

### 3. Analysis

{¶ 20} Upon our plain language review, we find the Agreement by its own terms explicitly granted the Nicholses "exclusive occupancy" of the Property. But the Agreement did not define the duration of the Nicholses' "exclusive occupancy" as pertaining for the length of their lives. Instead, their right of occupancy was dependent (upon "Marvin

Nichols and Carol Nichols, or either of them" (1) residing on the Property, concurrently with (2) employment by Leckie Farms or a shareholder of Leckie Farms, or retirement from such employment, (3) maintenance of the home and yard, and (4) use of the Property solely as their residence. Therefore, hypothetically, the Nicholses' right of "exclusive occupancy" could terminate before the end of their lives based upon the lapse of any of the above-stated conditions. There is nothing in the text of the Agreement that refers to the lives of the Nicholses as a measuring stick for determining the right of "exclusive occupancy."

{¶ 21} Furthermore, under the terms of the Agreement, the Nicholses did not have the right to leave the property or rent it to another during their lifetimes. Doing so would have conflicted with both the residency requirement and the provision stating that the Agreement was "personal to the parties and . . . not assignable." Both these provisions are inconsistent with the basic rights of a life estate holder "to sell, to give away, to mortgage, or to lease the land for a period not greater than the duration" of the life tenant's life. *Fruth*, 1995 WL 283891 at *3.

{¶ 22} Essentially, no aspect of the Agreement reflects the granting of a life estate. The Nicholses' right to occupancy was not based on their lives, but rather their fulfillment of certain conditions, and the Nicholses had no right to transfer the interest they had in the Agreement for the duration of the lives.

{¶ 23} In their appellate brief, the Nicholses argue that the phrase in the Agreement, "Leckie Farms, Inc. wishes to provide certain security," indicates that Leckie Farms intended to provide them with housing for the remainder of their lives. We disagree. The phrase "certain security" in the Agreement references the right of "exclusive occupancy" referenced elsewhere in the Agreement. But as stated above, the Nicholses' right of "exclusive occupancy" was premised on meeting the conditions stated

in the Agreement. If "certain security" referred to the Nicholses' enjoyment of the Property for life, then the Agreement would have in some way referenced the lives of the Nicholses. But it does not.

{¶ 24} The Nicholses cite *Evans v. Willis*, 2014-Ohio-1822 (5th Dist.), in support of their argument. In *Evans*, the Fifth District Court of Appeals considered whether R.C. Chapter 5321 governed the terms of a document titled "Life Lease." *Id*. at ¶ 12. That agreement referred to the tenant as the "lessee" and stated that she would have the right to remain in the home "for the rest of her life." *Id*. at ¶ 3. The court of appeals found that the "Life Lease" was not a rental agreement subject to R.C Chapter 5321, but rather concerned a life estate. *Id*. at ¶ 19.

{¶ 25} The Nicholses also cite *Karako v. Lindberg*, 1998 WL 257043 (11th Dist. Apr. 10, 1998). In *Karako*, the Eleventh District Court of Appeals considered whether a contract created a life estate where it contained language that "as long as [the tenant] is alive and wishes to do so, he has the right to live in the house at that location." *Id*. at *5. The court found that such language created a life estate. *Id.* at *6. The court also noted that contractual provisions requiring the tenant to pay taxes, insurance, utilities, and maintenance were consistent with the duties of a life tenant. *Id*.

{¶ 26} *Evans* and *Karako* are distinguishable from the case before us because of the language in the documents granting the tenants in those cases the subject properties "for the rest of her life" and "as long as he is alive," respectively. No similar language was employed in the Agreement before us. Further, the conditions stated for exclusive occupancy in the Agreement are inconsistent with the rights of a life tenant. *Fruth*, 1995 WL 283891 at *3.

{¶ 27} We find nothing ambiguous in the language of the Agreement. On its face, the Agreement did not create a life estate, but rather, it was a rental agreement for an

indeterminate term based on the Nicholses complying with certain conditions. It was error to resort to extrinsic evidence in order to find that the parties intended to create a life estate. *TRINOVA Corp. Pilkington Bros., P.L.C.*, 70 Ohio St.3d 271, 276-277, 1994-Ohio-524 (holding that evidence cannot be introduced to show that an agreement between the parties was materially different from that expressed by the clear and unambiguous language of the instrument). As such, we hold that the trial court erred as a matter of law when it determined that the Nicholses possessed a life estate in the Property. The Agreement is a "rental agreement" as defined in R.C. 5321.01(D), and is subject to R.C. Chapter 5321.[2]

{¶ 28} We sustain Croplands' first assignment of error.

### B. Permanent Injunction

{¶ 29} Croplands' second assignment of error states:

> THE TRIAL COURT ERRED IN ISSUING A PERMANENT INJUNCTION RESTRAINING CROPLANDS FROM PURSING A FORCIBLE ENTRY AND DETAINER ACTION AGAINST MARVIN NICHOLS AND CAROL NICHOLS ON THE GROUNDS THAT THEY HELD A LIFE ESTATE IN THE REAL PROPERTY, AS MARVIN NICHOLS AND CAROL NICHOLS DO NOT HOLD A LIFE ESTATE IN THE REAL PROPERTY, AND ANY SUCH LIFE ESTATE WOULD NOT HAVE BEEN ENFORCEABLE AGAINST CROPLANDS.

{¶ 30} In its second assignment of error, Croplands argues that the common pleas court's permanent injunction restraining Croplands from seeking to recover possession of the Property in a FED action was issued in error because it was based on the erroneous conclusion that the Nicholses possessed a life estate in the Property. We agree, and therefore sustain Croplands' second assignment of error, based on the same reasoning set forth in our discussion of Croplands' first assignment of error. The permanent

---

2. We make no comment or holding with respect to a potential FED action that Croplands may bring against the Nicholses.

injunction is vacated.

{¶ 31} Croplands also argues, alternatively, that even if the Nicholses possessed a life estate in the Property, Croplands was a bona fide purchaser of the Property with no knowledge of the existence of the unrecorded Agreement, and such life estate would therefore be unenforceable under R.C. 5301.25(A).  Given our resolution of Croplands' first argument in support of its second assignment of error, this second issue concerning Croplands' alleged status as a bona fide purchaser is moot and we decline to address it. App.R. 12(A)(1)(c).

{¶ 32} Judgment reversed and permanent injunction vacated.

HENDRICKSON and M. POWELL, JJ., concur.