[Cite as *Neyer Holding II, Inc. v. Huang*, 2025-Ohio-1776.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| NEYER HOLDING II, INC., | : | CASE NO. CA2024-01-015 |
| Appellant and Cross-Appellee, | : | O P I N I O N AND |
| | : | JUDGMENT ENTRY |
| - vs - | | 5/19/2025 |
| | : | |
| QIAO YUN HUANG AKA QIAO HUNG AKA WINNIE HUNT, | : | |
| Appellee and Cross-Appellant. | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV 2021 01 0028

Jeffrey S. Routh, for appellant and cross-appellee.

David B. Brewer, for appellee and cross-appellant.

## O P I N I O N

**BYRNE, P.J.**

{¶ 1} The matter before us involves both an appeal and a cross-appeal. The appeal by Appellant/Cross-Appellee Neyer Holding II, Inc. ("Neyer Holding") has been rendered moot. Our primary focus in this opinion, therefore, is on the cross-appeal.[1]

---

1. Pursuant to Loc.R. 6(A), we sua sponte remove this appeal from the accelerated calendar for purposes of issuing this opinion.

{¶ 2}  Appellee/Cross-Appellant Qiao Yun Huang, also known as Winnie Hunt ("Hunt") cross-appeals from the decision of the Butler County Court of Common Pleas, which granted a money judgment in favor of Neyer Holding on its breach of contract claim against Hunt and found against Hunt on her claims against Neyer Holding. For the reasons discussed below, we affirm the trial court's decision in part, reverse in part, and remand for the trial court to address the foreseeability of damages for early capital expenditures.

### I. Factual and Procedural Background

{¶ 3}  This dispute concerns a lease agreement between Neyer Holding, the owner of a commercial building, and its tenant, Hunt, who owned and operated a business (the Cabinet & Granite Depot) in the building. The lease began in 2011. Afterwards, Hunt and Neyer Holding twice extended the lease, until November 2023. However, in December 2020, Hunt stopped paying rent and left the premises. At that time, Hunt informed Neyer Holding that unresolved issues with the building's roof and water intrusion had triggered a breach of the lease agreement and justified her abandonment of the lease.

{¶ 4}  In December 2021, Neyer Holding filed a complaint against Hunt in the Butler County Court of Common Pleas, asserting that Hunt was in breach of contract by repudiating the lease and failing to pay rent and that Hunt owed damages totaling at least $458,104.30.[2] Neyer Holding also requested attorney fees.

{¶ 5}  Hunt answered and counterclaimed. Hunt's counterclaim's first cause of

---

2. Neyer proceeded against Hunt individually because she signed a personal guarantee for the lease. The lease agreement was made between Neyer Holdings II, Inc. and "Qiao Yun Huang dba H&Y Cabinet & Granite Depot, LLC." Apparently, this limited liability company was not in existence at the time of the filing of the complaint or the trial. Regardless, the action proceeded against Hunt, individually, and the parties have raised no issue in this regard.

action alleged that the lease agreement was never properly executed and was null and void. Hunt's second cause of action alleged that Neyer Holding breached the lease agreement. Hunt did not specify *how* Neyer Holding breached the lease agreement in her complaint, but it became evident at trial that Hunt was asserting that Neyer Holding breached the lease by charging her for building maintenance as a portion of her monthly rent payment. Hunt's third cause of action alleged that Neyer Holding had breached its duty to provide Hunt with quiet enjoyment of the premises. And Hunt's fourth cause of action asserted that she had performed work on the premises that enhanced the premises, and that as a result she was entitled to compensation from Neyer Holding under the doctrine of quantum meruit.

{¶ 6} The matter proceeded to a bench trial before a magistrate. At the beginning of the trial, Hunt indicated that she would only be proceeding on her second, third, and fourth causes of action, and not her first cause of action. And with regard to breach of quiet enjoyment, her third cause of action, she would be asserting this as an affirmative defense to Neyer Holding's breach of contract claim, not as a claim in its own right. The matter then proceeded to testimony. We will summarize the trial testimony relevant to this appeal below.

**A. Neyer Holding's Case**

{¶ 7} Neyer Holding called John Neyer to testify during its case in chief. He testified that he was Neyer Holding's president and that Neyer Holding owned a 45,000-square-foot facility built in the 1970s, located at 9850 Princeton-Glendale Road ("the Building").

{¶ 8} According to John Neyer, in 2011, Neyer Holding executed a lease with Hunt for 12,500 square feet of commercial space ("the premises") in the Building. The original lease term was 5 years. John Neyer explained that under the terms of the lease,

Hunt was obligated to pay a base rent figure, which was a certain dollar amount per square foot. Hunt was also obligated to pay an "additional rent" figure that was colloquially referred to as "CAM" (an abbreviation for "common area maintenance"). CAM included the costs of taxes, insurance, utilities, snow clearing, landscaping, and other maintenance elements of the Building. Hunt's obligation to pay CAM was on a pro rata basis, dependent on the square footage of her occupation of the Building relative to other tenants.

{¶ 9} John Neyer testified that Neyer Holding would determine the cost of CAM on an annual basis, through a budgeting process. The tenants of the Building would then be advised of their pro rata portion of CAM expenditures and would make monthly payments towards their obligation. Each year, a reconciliation would be performed on the budgeted CAM numbers and if the tenants paid more than actual CAM costs, they would receive a credit. Likewise, if a balance was due for CAM, then the tenants would receive a bill. Tenants were advised of their yearly CAM obligations in a statement sent 60 to 90 days after the end of the year. John Neyer stated that during Hunt's tenancy, she never questioned any CAM statements.

{¶ 10} John Neyer testified that after four years of renting the premises, Hunt asked to expand the portion of the Building that she rented. In October 2015, the parties agreed on terms and Neyer Holding and Hunt entered into a first amendment to the lease. The amendment expanded the premises to 17,200 square feet and extended the lease period for seven years, terminating in 2022. This first amendment contained a provision stating that Hunt was accepting the property "as is," with the condition that Neyer Holding inspect the HVAC equipment, ensure that it was operational, and repair a portion of the blacktop.

{¶ 11} A year and a half later, Hunt requested a second expansion of the premises. In March 2017, the parties executed a second amendment to the lease, which expanded

the premises to 21,900 square feet and extended the lease an additional year, to November 14, 2023.

{¶ 12} John Neyer testified that during her tenancy, Hunt made two inquiries about purchasing the Building. Neyer Holding introduced two emails in this regard. The first, dated November 27, 2017, was an email from Hunt asking whether the Building was for sale. In the second, dated June 6, 2018, Hunt again indicated that she would be interested in buying the Building. Nothing came of these requests; John Neyer testified that his company was not interested in selling the Building.

{¶ 13} John Neyer admitted that the company was aware of problems with the Building's roof. According to company records, Hunt gave Neyer Holding notice six times that she was concerned about leaks from the roof. John Neyer testified that his company responded to each of those complaints, either by dispatching Neyer Holding's internal maintenance crew, or, when the matter was beyond their abilities to remedy, by dispatching a roofing contractor. Neyer Holding introduced exhibits concerning the roof issue, including a log that reflected complaints about the roof and a series of invoices that related to roof repairs performed during Hunt's tenancy.

{¶ 14} John Neyer identified an exhibit consisting of a letter addressed to him from Hunt and dated December 11, 2020 in which Hunt informed John Neyer that she would be moving out of the premises at the end of 2020. In the letter, Hunt informed John Neyer that she had experienced "many repeating issues" while leasing the premises, but that the roof leak was the primary reason that she was moving her business. Based on the date of the termination notice in the letter, Hunt intended to abandon the lease approximately 34 months prior to the expiration of the lease term.

{¶ 15} John Neyer testified that Hunt never informed him that she was considering purchasing a building—that is, one other than the Building—for her business. Nor did she

ever send the company any notice via certified or registered mail that her concerns over the condition of the Building's roof had caused a default event under the terms of the lease. This is relevant because the lease contained a provision stating that Neyer could not be held in breach of the lease unless the lessee provided written notice, sent via certified or registered mail, and permitting Neyer 30 days to cure the defect.

{¶ 16} John Neyer testified that after Hunt announced her intention to leave the premises and the company obtained the keys to the premises, they inspected the premises and found it in very poor condition. There was an enormous amount of "junk" left, including two shipping containers that were full, and "inches" of granite dust on the floor, where cutting and polishing took place. There were also full slabs of granite and numerous partial granite pieces throughout the premises. Neyer Holding introduced exhibits documenting the condition of the premises as well as its cleanup costs, which totaled $14,992.36.

{¶ 17} John Neyer also testified about his company's efforts to mitigate damages and relet the premises after Hunt abandoned it. Neyer Holding hired Colliers, a commercial realty brokerage firm, to find new tenants. Once tenants were located, Neyer Holding made capital improvements to the premises in order to secure lease agreements. Neyer Holding first relet a portion of the premises in March 2021 to one tenant. Two additional tenants relet a portion of the premises in July 2021. And in January 2023, Neyer Holding filled the remaining space with a fourth tenant.

{¶ 18} John Neyer testified that in total, Neyer Holding spent $233,185.51 in "early capital improvements" in order to market, secure, and install the four new tenants in the premises. John Neyer also testified that the new tenants paid fifty percent more in base rent than Hunt. According to John Neyer, this increase in base rent was prompted by the capital improvements that Neyer Holding made to the premises to secure the four tenants.

{¶ 19} John Neyer further testified as to what he believed was the portion of early capital improvements attributable to Hunt's abandonment of the lease. John Neyer explained that typically, his company would expect to have three to five years of rent revenue from an occupying tenant prior to having to make capital improvements necessary to relet premises to other tenants. Because Hunt abandoned the lease early, the company needed to make these capital improvements earlier than expected.

{¶ 20} An exhibit, introduced at trial, broke down Neyer Holding's $233,185.51 capital improvements investment by the portion applicable to each of the four new tenants. According to John Neyer, these figures, which represented the capital improvements necessary to tailor the space to each tenant's requirements, were a portion of the "cost of the deal" to acquire each new tenant. The cost of each deal also included Colliers' fee for finding a new tenant.

{¶ 21} For each "deal" with a new tenant, John Neyer calculated the portion of Hunt's lease term that the tenant rented their portion of the premises. For example, the first new tenant, installed in March 2021, completed 56.9% of Hunt's remaining lease term. For this tenant, the total cost of early capital investment (capital improvements to the premises and broker fees) was $56,056.88. John Neyer calculated that 56.9% of that figure was $33,603.36, which John Neyer believed Hunt should be responsible for paying in damages. When considering all four tenants, and the portion of time they spent covering Hunt's remaining lease term, John Neyer calculated that Hunt's total responsibility for early capital expenditures in the premises was $82,075.86 of the total $233,185.49 expenditures.

{¶ 22} Regarding rent damages, John Neyer calculated the difference between the rent Neyer Holding expected to receive from Hunt and the rent it received from the four new tenants once they were in place. Based on this calculation, and some supporting

exhibits, John Neyer asserted that his company was damaged in the amount of $72,218.91 by Hunt's early departure and breach. John Neyer arrived at this figure by totaling Hunt's expected base rent plus CAM payments during the approximate 34 month period prior to the expiration of the lease term ($490,661.74). John Neyer then subtracted the base rent and CAM payments actually paid for by the four new tenants during the same period ($418,442.82). John Neyer explained that this rent differential of $72,218.91 would have been greater had Neyer Holding not spent the $233,185.51 in capital investments, because, as stated previously, the improvements to the premises allowed the company to charge the new tenants a higher base rent.

## B. Hunt's Case

{¶ 23} In addition to testifying herself, Hunt called three witnesses at trial: Debbie Bosch, Derick Hunt, and Aaron Fry. We summarize Bosch's and Derick Hunt's testimony below as it is relevant to the issues on appeal.

## 1. Debbie Bosch's Testimony

{¶ 24} Debbie Bosch testified that the company she worked for would send their customers to the premises to purchase cabinets and countertops from Hunt's company, the Cabinet & Granite Depot. Bosch stated that she had visited the premises and felt it was in need of attention. The ceiling tiles were stained and there was a musty odor. In the rear of the facility, where they fabricated countertops, there were large puddles of water and the ceilings would drip water. It was the worst facility of this type Bosch had ever seen and it did not make a good impression on her customers.

{¶ 25} However, on cross-examination, Bosch admitted that despite the conditions at the premises and her reservations, she continued to send her customers to the Cabinet & Granite Depot because of the people who ran the business.

**2. Derick Hunt's Testimony**

{¶ 26} Hunt's husband, Derick Hunt—whom we will refer to as "Derick" to avoid confusion with Hunt—testified that he was a part owner of the Cabinet & Granite Depot. Derick testified at length about the issues with the Building's roof. According to Derick, the roof began leaking in 2015. Derick estimated that he spent $4,000 replacing ceiling tiles between 2015 and when the Hunts moved their company out. He recalled that a Neyer Holding maintenance worker, when he was inspecting ceiling tiles, took his knife to a ceiling tile and it "burst" with water. Derick recounted several incidents where water intruded into the building and destroyed items, like a computer tower.

{¶ 27} Derick testified that in 2015, he and Hunt paid $30,000 to upgrade the electric at the premises from 240 volt to 480 volt. This electrical upgrade was required for a particular piece of machinery that the Cabinet & Granite Depot used in the granite fabrication process.

**3. Winnie Hunt's Testimony**

{¶ 28} Hunt testified extensively about the problems with the Building's roof and numerous water intrusion events over the years. However, when asked if Neyer Holding responded to her complaints about the leaks, Hunt agreed that the company did respond.

{¶ 29} Hunt explained that she offered to buy the Building because she thought that this was the only way that she could get the roof fixed and prevent further leaks. She explained that she liked the location and had built her business there. Ultimately, she said, it became clear to her that Neyer Holding was never going to fix the roof and she needed to find a different location for her business.

{¶ 30} Hunt stated that when she received the bills for CAM, she paid them. Hunt stated that she did not read the entire lease when she signed it, but implied that she had an attorney review the lease. Based on her understanding of the lease, Hunt believed

that all exterior aspects of the building were the sole financial responsibility of Neyer Holding, and that she was not financially responsible for the maintenance of the exterior of the building.

### C. The Magistrate's Decision

{¶ 31} In his decision, the magistrate noted that the testimony of the parties primarily concentrated on two issues: the condition of the roof and the CAM payments.

{¶ 32} The magistrate noted that both parties were sophisticated in business matters. In this regard, the magistrate noted that Hunt ran a successful business at the premises and that upon leaving the premises, and while the lease remained in effect, she had moved her business into a new location at a building which she purchased for over $2,000,000. As such, the magistrate did not find any disparity in the negotiating positions of the parties when they entered into the lease and its subsequent extensions.

{¶ 33} With regard to Hunt's affirmative defense of quiet enjoyment (initially presented in her complaint as her third cause of action), the magistrate found that Neyer Holding responded when Hunt notified it of a roof leak. The magistrate found telling that despite the issues with the roof, Hunt twice extended her lease. The magistrate also noted Bosch's testimony that while she thought the premises were not in the best of conditions, she did not stop sending her clients to Hunt's business.

{¶ 34} Finally, the magistrate noted that the lease contained a provision directing a party to provide specific notice if it believed the other party was in default. This provision also provided time for the other party to provide a remedy. The magistrate found that Hunt never provided Neyer Holding with any formal notice of default prior to providing notice that she was vacating the premises. The magistrate also viewed Hunt's repeated offers to purchase the building as indicating that the conditions were not as poor as Hunt and her witnesses claimed. Upon consideration of the above, the magistrate concluded that

Hunt had not established that Neyer Holding denied her quiet enjoyment of the premises.

{¶ 35} With regard to her second cause of action—that the CAM portion of her rent payment violated the lease—the magistrate disagreed with Hunt's interpretation of the contract, finding that while the lease made Neyer Holding responsible for the upkeep of certain items, the lease also provided that the costs of maintenance and repairs could be passed along as operating expenses to Hunt in the form of CAM payments. As such, the magistrate found that the inclusion of CAM payments within Hunt's rent did not constitute a breach of the lease agreement.

{¶ 36} With regard to Hunt's fourth cause of action—seeking compensation from Neyer Holding for Hunt's improvements to the property under a theory of quantum meruit—the court found that the lease disposed of this claim. Specifically, Section 9 of the lease provided that "[a]ll alterations, additions and improvements made by [Hunt] shall become the property of [Neyer Holding] upon the making thereof and shall be surrendered to [Neyer Holding] upon the expiration of this Lease." The court found that based on this contractual provision, Hunt had no valid claim for quantum meruit. Additionally, the magistrate noted that the upgrade of the electrical system to the property was accomplished in order to operate a specific machine used in Hunt's industry and that the upgrade was of no use to future leaseholders.

{¶ 37} Turning to Neyer Holding's claim against Hunt for breach of contract, the magistrate found that there was no dispute that Hunt vacated the premises in December 2020, prior to the expiration of the lease term, and was liable for damages.

{¶ 38} The magistrate found that Neyer Holding was able to relet the premises and its effort to mitigate its damages had persisted even after the lawsuit was filed. The magistrate found that Neyer Holding had set forth a "logical, reliable, and creditable" account for the damages it sought, which consisted of three categories of damages: rent

differential, cost of clean-up beyond ordinary wear and tear, and "early capital expenditures."

{¶ 39} The magistrate found all three damages categories were supported by the evidence presented at trial. The magistrate found that Hunt's breach of the lease entitled Neyer Holding to the rent differential figure that Neyer Holding presented at trial. The magistrate also found that the damages requested by Neyer Holding for the cost of cleanup beyond ordinary wear and tear was supported by the testimony. Finally, with regard to the early capital expenditures, the magistrate found that Neyer Holding was entitled to the damage amount requested because Hunt's abandonment of the premises "shifted any costs it was to incur for locating, securing, and ultimately allowing the move-in of new [lessees] from a date in later 2023 to the beginning of 2021."

{¶ 40} Accordingly, the magistrate recommended that judgment be entered in Neyer Holding's favor in the amount of $169,287.13. The break-down of the damage amount was as follows: (1) $72,218.91 for rent differential; (2) $14,992.36 for cost of clean-up beyond ordinary wear and tear; and (3) $82,075.86 for early capital expenditures.

### D. Objections, Trial Court Decision, and Appeal.

{¶ 41} Hunt objected to the magistrate's decision. Hunt's specific objections are reiterated in Hunt's assignments of error and we will not reproduce them here. The trial court overruled Hunt's objections, essentially agreeing in full with the rationale set forth in the magistrate's decision.

{¶ 42} Hunt appealed, raising four assignments of error.

### II. Law and Analysis

### A. Neyer Holding's Appeal

{¶ 43} Before addressing the merits of Hunt's appeal, we note that Neyer Holding

is the appellant in this case and Hunt is the cross-appellant. In its brief on appeal, Neyer Holding assigned error to (1) the trial court's failure to hold a hearing on attorney fees, (2) its purported failure to issue a final appealable order (as it had not yet decided the issue of attorney fees), and (3) its failure to grant Neyer Holding's Civ.R. 60 motion regarding the attorney fee issue.

{¶ 44} We will briefly discuss the procedural background regarding these issues. The magistrate's decision on both Neyer Holding's and Hunt's claims ordered Neyer to file a motion for attorney fees if it intended to request attorney fees. Neyer filed its motion for attorney fees. A hearing on attorney's fees was scheduled but later vacated due to the filing of Hunt's objections to the magistrate's decision. When the trial court issued its decision overruling Hunt's objections (over a year after the filing of the magistrate's decision), it erroneously indicated that Neyer had never filed a motion for attorney fees as directed by the magistrate. The trial court found that due to Neyer Holding's failure to prosecute its attorney fee request (which, again, was an incorrect assumption), it would proceed to enter the money judgments as set forth in the magistrate's opinion. Thus, the court impliedly denied Neyer Holding's motion for attorney fees.

{¶ 45} Neyer Holding's appeal and its three assignments of error concern this aspect of the trial court's decision. But following the filing of the appeal, the parties jointly informed this court that the matter of attorney fees was settled through a post-judgment stipulation filed in the trial court. Accordingly, and based on the parties' joint representations, we find Neyer's appeal moot and overrule Neyer Holding's three assignments of error. We now turn to the merits of Hunt's cross-appeal.

**B. The CAM Payments**

{¶ 46} Hunt's first assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING THE OBJECTION OF QIAO HUNT AND ENFORCED ONE CLAUSE OF THE LEASE AGREEMENT THOUGH IT CONFLICTED WITH ANOTHER CLAUSE, WHERE THE PARTIES HAD A DIFFERENT UNDERSTANDING OF EACH CLAUSE, AND THE TRIAL COURT RULED IN FAVOR OF THE DRAFTER OF THE LEASE AGREEMENT.

{¶ 47} In support of this assignment of error, Hunt argues that the trial court erred by not finding in her favor on her second counterclaim alleging that Neyer Holding breached the lease agreement by charging her for CAM. Hunt argues that while Section 7 of the lease made Neyer Holding financially responsible for the costs of certain repairs to the premises, Section 4.2 provided that Hunt would be required to make CAM payments to share in the operating costs of the premises on a pro rata basis. Hunt argues that these sections conflicted with one another and that by including the CAM payments in the amount of her rent, Neyer Holding breached Section 7 as it stated that Neyer Holding would be responsible for repairs to the property. Hunt argues that to the extent the lease is ambiguous, it should be construed in her favor as the non-drafter.

**1. Standard of Review and Applicable Law**

{¶ 48} This assignment of error involves the interpretation of provisions in a lease contract. When reviewing issues of contract interpretation, we apply a de novo standard of review. *Nichols v. Croplands, L.L.C.*, 2025-Ohio-128, ¶ 15 (12th Dist.); *Pierce Point Cinema 10, L.L.C. v. Perin-Tyler Family Found., L.L.C.*, 2012-Ohio-5008, ¶ 10 (12th Dist.). In contractual interpretation, our role is to give effect to the intent of the parties. *Certain Interested Underwriters at Lloyd's, London, England v. Total Quality Logistics, L.L.C.*, 2023-Ohio-4470, ¶ 12 (12th Dist.). Generally, we presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement. *Id*. We review

the language of a contract holistically, and our construction should attempt to harmonize all provisions of the document, rather than to produce a conflict. *Pierce Point* at ¶ 11. That is, a contract should be construed to give effect to all of its provisions. *Id*.

{¶ 49} "A contract that is, by its terms, clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract." *Cooper v. Chateau Estate Homes, L.L.C.*, 2010-Ohio-5186, ¶ 12 (12th Dist.); a*ccord Nichols* at ¶ 14. A contract is ambiguous, however, if its provisions are susceptible to two or more reasonable interpretations. *Cooper* at *id.* Whether a contract's terms are clear or ambiguous is a question of law for the court. *Id.*, citing *Westfield Ins. Co. v. Huls Am.*, 128 Ohio App.3d 270, 291, (10th Dist.1998).

## 2. Analysis

{¶ 50} Two sections of the lease agreement are at issue in this assignment of error. First, Section 7 of the lease is titled "Repairs" and states:

> Lessor [that is, Neyer Holding] shall keep or cause to be kept in as good repair, as same are in when possession hereunder is given to Lessee [that is, Hunt], the foundations, the roof and the structural soundness of the floors, and the exterior walls (excluding the interior surface of the exterior walls and excluding the exterior and interior portions of all windows, doors, plate glass and showcase); the exterior water, sewage and gas and electrical services up to the point of entry to the Premises; the common areas in the Building including, without limitation, the sidewalks and parking areas, the heating and air conditioning systems, except ordinary maintenance; and Lessor [Neyer Holding] shall make all repairs and restoration made necessary by fire or other peril covered by the standard extended coverage endorsement on fire insurance policies; provided, however, that Lessee [Hunt] shall reimburse Lessor [Neyer Holding] upon demand for the cost of repairing any damage to the Premises, the building or the common areas caused by the negligence or the deliberate act of Lessee [Hunt], its employees, agents or invitees.

{¶ 51} Second, Section 4.2 of the lease is titled "Additional Rent" and states:

> In addition to the Minimum Rental set forth in Section 4.1,

> Lessee [Hunt] shall pay as "Additional Rent" during the term of the Lease and any extension or renewal thereof, Lessee's [Hunt's] pro rata share of the Operating Expenses (as defined below) for the Building. In addition, Lessee [Hunt] shall pay any and all sums of money or charges required to be paid by Lessee [Hunt] under the terms of this Lease whether designated Additional Rent or not, and such amounts, if not paid when due, shall be collectible as additional rent with the next installment of Minimum Rental thereafter falling due as provided herein and shall be subject to all provisions of this Lease and of law as to default in the payment of rent; provided, nothing herein shall be deemed to excuse or delay the obligation of Lessee [Hunt] to pay any amount of money or charge at the time the same shall become due under the terms of this lease. Lessee's [Hunt's] obligation to pay Additional Rent shall commence on the Commencement Date. Initially, Lessee [Hunt] agrees to pay Lessor [Neyer Holding] as Additional Rent the sum of $22,875.00 in the first year of the Term payable in equal monthly installments of $1906.25 each beginning on the first day of each month, which is budgeted for one year of the Lease.

> Operating Expenses. Lessee [Hunt] shall pay Lessee's [Hunt's] pro rata share (as hereafter defined) of all Operating Expenses incurred by Lessor [Neyer Holding] with respect to the Building[3] which shall be paid in equal monthly installments. The term "Operating Expenses" shall mean all expenses, costs and disbursements (but not replacement of capital investment items) of every kind and nature which Lessor [Neyer Holding] shall pay or become obligated to pay because of, or in connection with, the ownership, operation and maintenance of the Building, including but not limited to the following: . . .

Section 4.2(a)(i) thru (v) then describe specific items covered under "CAM" including parking area maintenance, maintenance of the building generally, and utility costs associated with operating the common areas.

{¶ 52} In her brief, Hunt argues that Section 7, "Repairs," unambiguously made Neyer Holding operationally and financially responsible for maintaining the roof, exterior

---

3. The lease designates the "Building" as 9850 Princeton-Glendale Road, Cincinnati, Ohio. The lease differentiates the "Building" from the leased premises, which were described in the original lease as suite 6 of the Building, comprised of approximately 12,500 square feet of space.

walls, water, sewage, gas and electrical services, sidewalks, parking areas, etc. of the Building. Hunt contends that Neyer Holding "willfully and intentionally" violated Section 7 by including the cost for maintaining these items in CAM.

{¶ 53} Notably, Hunt does not discuss the impact of Section 4.2 in her appellate brief. Instead, she suggests the contract was ambiguous as to who was responsible to pay for exterior repairs and CAM and that this ambiguity should be construed in her favor.

{¶ 54} We do not find the contract ambiguous. Nor do we find any plain-language support for Hunt's interpretation of the contract. Under a plain reading of the contract, Section 7 made Neyer Holding the party responsible for ensuring that certain aspects of the Building, mostly involving the exterior of the building and common areas, were kept in good repair. That is, the lease provided that Neyer Holding would be exclusively responsible for managing those repairs. This makes sense, as the Building is Neyer Holding's property, and Neyer Holding would presumably want to control how those kind of repairs were performed and by whom those repairs were performed.

{¶ 55} While Section 7 made Neyer Holding the responsible party for ensuring that these items were kept in good repair, this provision does not conflict with Section 4.2. Under Section 4.2, Hunt agreed that Neyer Holding's "operating expenses" with regard to the Building would be paid by Hunt on a pro rata basis. The term "operating expenses" is defined expansively, and included "all expenses, costs and disbursements (but not *replacement* of capital investment items) of every kind and nature which Lessor shall pay or become obligated to pay because of, or in connection with, the ownership, operation and maintenance of the Building . . . ." (Emphasis added.)

{¶ 56} Thus, under Section 4.2, any operating expenses in connection with repairs and maintenance of the building could be contractually passed on to Hunt on a pro rata basis. Other than replacement of capital items, the plain language of the contract does

not limit the scope of operating expenses. Essentially, any repair or maintenance work at the Building could be passed on to Hunt. While being able to pass these expenses along to Hunt was certainly a good deal for Neyer Holding but not so good of a deal for Hunt, this arrangement does not constitute a breach of the lease agreement. On the contrary, it is specifically provided for by the plain language of the lease agreement. Hunt acknowledged that she would pay for these expenses on a pro rata basis by executing the lease agreement. Notably, the record indicates that Hunt never questioned the bills for CAM for nearly a decade and consistently paid the bills, until she abandoned the lease and was sued for rent.

{¶ 57} We do not find that the trial court erred in finding against Hunt on her second cause of action. Neyer Holding was authorized under Section 4.2 of the lease agreement to include CAM in the calculation of Additional Rent.

{¶ 58} We overrule Hunt's first assignment of error.

### C. Damages

{¶ 59} Hunt's second assignment of error states:

> THE TRIAL COURT ERRED IN OVERRULING THE OBJECTION OF QIAO HUNT AND GRANTED NEYER HOLDINGS ALL DAMAGES REQUESTED WHEN SOME DAMAGES REQUESTED ARE NOT RECOVERABLE UNDER OHIO LAW.

{¶ 60} In her second assignment of error, Hunt argues that the trial court awarded damages to Neyer Holding that were "not recoverable under Ohio Law." Hunt directs our attention to three elements of the overall damages award. We will address those elements in turn. But before doing so, we will explain certain general principles related to contract damages that inform our analysis of all three of Hunt's challenges to the damages awarded in this case.

**1. Background Law**

{¶ 61} In a breach of contract action, money damages are intended "'to place the aggrieved party in the same position it would have been in had the contract not been violated.'" *Miami Valley Constr. Group v. Thompson*, 2021-Ohio-4358, ¶ 36 (12th Dist.), quoting *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 2005-Ohio-2974, ¶ 26. Depending on the circumstances of a particular case, money damages may address one or more of the non-breaching party's interests with respect to the contract; these interests may include its expectation interest, its reliance interest, or its restitution interest. *Father's House Internatl., Inc. v. Kurguz*, 2016-Ohio-5945, ¶ 21-22 (10th Dist.), citing *Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, 2013-Ohio-3890, ¶ 29 (10th Dist.) and 1 Restatement of the Law 2d, Contracts, § 344(c) (1981). For reasons explained further below, this case involves damages related to Neyer Holding's expectation interest.

{¶ 62} Subject to certain limitations, damages related to a party's expectation interest may be calculated pursuant to the following formula:

> (a) the loss in the value to [the non-breaching party] of the other party's performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that [the aggrieved party] has avoided by not having to perform.

1 Restatement of the Law 2d, Contracts, § 347 (1981).

{¶ 63} It is well established that a commercial lessor has a duty to mitigate damages caused by a lessee's breach and that mitigating damages is accomplished by leasing the premises to a new tenant or tenants. *Frenchtown Square Partnership v. Lemstone, Inc.*, 2003-Ohio-3648, ¶ 21; *Chilli Assocs. Ltd. Partnership v. Denti*

- 19 -

*Restaurants*, 2023-Ohio-1978, ¶ 56 (4th Dist.).

{¶ **64**} We now turn to Hunt's specific arguments regarding three elements of the trial court's damages award.

## 2. Damages Related to CAM Payments

{¶ **65**} In the case before us, the magistrate awarded $72,218.91 to Neyer Holding for "rent differential" damages—that is, unpaid rent—caused by Hunt's breach of the lease agreement, and the trial court affirmed this amount. The award of rent differential damages was meant to compensate Neyer Holding for the rent payments anticipated by the lease agreement that Hunt did not pay due to her early departure and breach. In other words, the trial court awarded rent differential damages based on Neyer Holding's expectation interest in the lease agreement. 1 Restatement of the Law 2d, Contracts, § 347 (1981).

{¶ **66**} Hunt challenges the $72,218.91 rent differential award in two respects. First, Hunt argues that the CAM payments discussed above were not allowable under the terms of the lease agreement and thus the trial court's rent differential award was in error to the extent it allowed Neyer Holding to recover back CAM payments as an element of rent differential. Hunt relies on the argument she set forth in her first assignment of error, and she does not cite any additional authority that would limit the recovery of these CAM payments as damages in a breach of contract claim. Given our disposition of Hunt's first assignment of error, this argument lacks merit. As stated previously, Section 4.2 of the lease authorized Neyer Holding to require Hunt to make CAM payments. As a result, the trial court did not err in allowing recovery of back CAM payments as an element of rent differential damages for Neyer Holding's breach of contract claim.

{¶ **67**} Second, Hunt argues that even if damages for CAM payments were properly awarded (which we conclude they were), the trial court erred in its calculation of

these damages and improperly relied on estimates rather than actual CAM data that was in the record.

{¶ 68} John Neyer testified that with respect to this challenged portion of the rent differential calculation, he used the actual CAM payments for 2021. For 2022, he used budgeted CAM payments. For 2023, he added a five percent increase to the 2022 CAM payments, which he testified was a "relatively modest" increase. Plaintiff's Exhibit 9, the exhibit depicting Neyer Holding's calculation of rent differential, reflects CAM payments of $3.36 per square foot in 2021, $3.22 per square foot in 2022, and $3.38 per square foot in 2023. John Neyer further testified that he used the same three figures in his calculation of the offsetting rent for the new tenants. Therefore, he explained, if the actual CAM figures were different, it was a "wash mathematically if the CAM was up or down of that."

{¶ 69} Thus, Hunt is incorrect, at least with respect to 2021, that the CAM payments were not the "actual figures." However, Neyer Holding did use budgeted or projected figures to determine CAM payments for 2022 and 2023. Hunt argues that the trial court erred by not using the "actual figures" and states that the actual figures are listed on three defense exhibits. Hunt never states what the "actual figures" are in her brief, but states that "presumably, the actual figures weren't as high as the average figures provided." Based on this language, Hunt does not appear to know the "actual figures," or whether or not they were higher or lower than the budgeted or projected figures testified to by John Neyer. We have reviewed the three exhibits on which Hunt relies and are unable to determine how they demonstrate a calculation of the "actual figures." One document, Defendant's Exhibit C, includes the figure "3.22," which was the budgeted per-square-foot charge for 2022.

{¶ 70} Generally, damages in breach of contract cases must be proven with

"reasonable certainty." *Woehler v. Brandenburg*, 2012-Ohio-5355, ¶ 35 (12th Dist.). "[D]amages are not uncertain merely because they cannot be calculated with absolute exactness; it is sufficient if the evidence affords a reasonable basis for computing damages, even if the result is only an approximation." *Id*.

{¶ 71} John Neyer's testimony supported his calculation of expected CAM payments during Hunt's tenancy within a reasonable certainty. Hunt cites no law that would indicate that budgeted or projected figures could not be used to determine, within a reasonable certainty, Neyer Holding's expectation damages for CAM payments. The 2022 budgeted CAM figures were less than the actual CAM figures for 2021, and the 2023 projected CAM figures were nearly identical to the actual CAM figures for 2021. We find no error here.

### 3. Damages Related to Early Capital Expenditures

{¶ 72} The magistrate awarded $82,075.86 to Neyer Holding for "early capital expenditures" the company incurred in its effort to secure new tenants in the premises after Hunt's breach of the lease agreement. The trial court affirmed this amount.

{¶ 73} Hunt argues that damages for Neyer Holding's early capital expenditures are not recoverable under Ohio contract law because Neyer Holding would have incurred the early capital expenditures regardless of whether she breached the lease. She explains that if she had fulfilled her lease terms, Neyer Holding would have expended funds upon her expiration of the lease to make capital improvements needed to relet the premises to new tenants and she would not have been responsible for those costs. She argues that because Neyer Holding would have made capital expenditures to relet the premises even if she had fulfilled her lease terms, these expenditures were not damages the trial court could lawfully award to Neyer Holding. Hunt cites no authority for this specific proposition. Instead, Hunt cites general contract law on damages providing that

damages awarded in a contract action are designed to place the aggrieved party in the same position it would have been had the contract not been violated. She asserts that the award of damages to Neyer Holding for its capital expenditures conflicts with this principle.

{¶ 74} We first observe that the trial court's award of damages for Neyer Holding's early capital expenditures was not related to the company's expectation interest because no provision in the lease agreement established any obligation on Hunt's part to pay Neyer Holding for capital expenditures it may make to relet the premises after Hunt's departure. Instead, the early capital expenditures—aimed at securing new tenants in the premises—were related to Neyer Holding's efforts to mitigate its damages.

{¶ 75} We already explained above that, in a breach of contract case, net expectation damages may be calculated using a formula that adds "any other loss, including incidental or consequential loss, caused by the breach" to the baseline expectation value. 1 Restatement of the Law 2d, Contracts, § 347 (1981). "Incidental" loss in this context includes costs incurred in a non-breaching party's effort to mitigate damages, such as "where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction." *Id.* at Comment c. Ohio courts agree that such incidental losses may be awarded as damages. See *Carr v. Ed Stein Realtors*, 10 Ohio App.3d 242, 243 (9th Dist. 1983) (holding that newspaper advertising in an attempt to secure a new tenant is a necessary and foreseeable element of mitigating damages and a tenant abandons the premises and breaches the lease).

{¶ 76} Two critical considerations regarding incidental losses incurred in furtherance of mitigation are relevant here.

{¶ 77} First, these incidental losses are only recoverable if they are reasonable. *Frenchtown*, 2003-Ohio-3648 at ¶ 21 ("[t]he lessor's efforts to mitigate must be

- 23 -

reasonable, and the reasonableness should be determined by the trial court."); *Chilli* 2023-Ohio-1978 at ¶ 56 (similar); 1 Restatement of the Law 2d, Contracts, § 347, Comment c (1981) (incidental losses are recoverable when they are "incurred in a reasonable effort, whether successful or not, to avoid loss").

{¶ 78} Second, incidental losses are not recoverable if they were not foreseeable. 1 Restatement of the Law 2d, Contracts, § 351 (1981). The Restatement explains:

> (1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
>
> (2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
>
>> (a) in the ordinary course of events, or
>>
>> (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.
>
> (3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.

*Id.* The commentary to this section of the Restatement reiterates that contracting parties are "generally expected to take account of those risks that are foreseeable," and clarifies that "It is enough, however, that the loss was foreseeable as a probable, as distinguished from a necessary, result of [the breaching party's] breach." *Id.* at Comment a.

{¶ 79} Here, Neyer Holding undertook efforts to mitigate its damage resulting from Hunt's breach by (1) hiring Collier's, a commercial broker, and (2) undertaking capital improvements to the property necessary for the specific needs of four new tenants. The magistrate recommended a damage award in favor of Neyer Holding that partially made it whole with regard to its expenses in hiring Collier's and making improvements to the

premises following Hunt's breach.

{¶ 80} In approving Neyer's requested damages, the magistrate noted that Neyer Holding had a duty to mitigate and that it had set forth a "logical, reliable, and creditable account for the damages it sought." The trial court, in turn, found that the magistrate's decision had set forth a sufficient basis in law for the recovery of the damages. While neither the magistrate nor the trial court explicitly found the early capital expenditures "reasonable," they found as much using different words, stating that the expenditures were "logical, reliable, and creditable."

{¶ 81} But neither the magistrate nor the trial court addressed—either explicitly or implicitly—whether the early capital expenditures were *foreseeable* to Hunt. That is, did Hunt, at the time of contracting, have "reason to foresee as a probable result of the breach" the actions taken by Neyer Holding with respect to mitigating its damages? The court's failure to address the foreseeability of Neyer Holding's early capital expenditures to Hunt at the time she executed the lease agreement left the trial court's analysis of this aspect of damages incomplete. *See Offenberger v. Beulah Park Jockey Club, Inc.*, 1979 WL 209570, *3 (10th Dist.) citing 22 Am.Jur.2d, Damages, § 55, at 85-86 (1965) ("'damages must either have been within the contemplation of the defaulting party at the time he entered into the contract or be so likely to result from the breach that they can reasonably be said to have been foreseen, contemplated, or expected by him at the time the contract was made, as being a probable or natural result of the breach.'").

{¶ 82} Based on the trial court never having made any findings with regard to foreseeability of these incidental losses, we partially sustain Hunt's second assignment of error and vacate the damage award of $82,075.86 for early capital expenditures. We remand the matter to the trial court to determine whether Neyer Holding's early capital expenditure losses were, in whole, or in part, foreseeable to Hunt when executing the

contract.[4]

## 4. Damages for Cost of Repairs

{¶ 83} Finally, the trial court awarded $14,992.36 to Neyer Holding for the cost of repairs to the premises beyond reasonable wear. Hunt argues that this damages award was not supported by the evidence. However, Hunt does not point to any particular amount of the damage award that was unsupported by the evidence, and argues that the trial court simply accepted Neyer Holding's claim as to what costs were reasonable. Instead of arguing her assignment of error in her brief, Hunt invites us to consider an argument presented in her written closing argument, without further comment.

{¶ 84} It is not the role of the appellate court to search the record to support any assignment of error and craft an appellant's argument for him or her. *See Ostigny v. Brubaker*, 2024-Ohio-384, ¶ 37 (12th Dist.). We have reviewed the record and have found that competent and credible evidence exists in the record to support the trial court's conclusion that Neyer Holding expended costs related to making repairs that went beyond reasonable wear. In this regard, John Neyer testified about the condition of the property, which was supported by numerous photographs depicting the poor condition of the premises and the need for significant clean-up, including the clean-up of hazardous materials (granite dust) requiring a specialized clean-up contractor. In addition, Neyer Holding introduced invoices reflecting the costs to clean the premises. Accordingly, we find no merit to this argument.

{¶ 85} We partially sustain and partially affirm Hunt's second assignment of error.

---

4. As discussed above in our summary of John Neyer's testimony, he presented his calculation of loss with regard to the capital improvements based on the time remaining on Hunt's lease with respect to each new tenant. The magistrate and trial court simply accepted this calculation without analysis. We have attempted to discern, from a review of John Neyer's testimony, the logical basis for this calculation. We understand that John Neyer believed that this percentage was somehow attributable to the lack of rent revenue. We remain uncertain about the methodology, but it was not an issue that was briefed to the trial court, or this court. We therefore do not review that issue, and only note it here for any questioning readers.

**D. Quiet Enjoyment**

{¶ 86} Hunt's third assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING THE OBJECTION OF QIAO HUNT THAT NEYER HOLDINGS DENIED THE QUIET ENJOYMENT OF THE PROPERTY FOR DEFENDANT'S COMPANY.

{¶ 87} Hunt argues that the trial court erred in finding against her on her quiet enjoyment affirmative defense. Hunt's argument here is evidentiary in nature—that is, she argues that the evidence established that Neyer Holding denied her the quiet enjoyment of the premises. Challenges to the evidence in a civil case are subject to a manifest-weight-of-the-evidence analysis, which is the same analysis applied in criminal cases. *Suburban Realty L.P. v. MD Vape & Tobacco, L.L.C.*, 2023-Ohio-3198, ¶ 37 (12th Dist.); *Ohio Dist. Council Inc. of the Assemblies of God v. Speelman,* 2018-Ohio-4388, ¶ 18 (12th Dist.); a*ccord Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17.

{¶ 88} When considering a challenge to the manifest weight of the evidence, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered. *Hacker v. House*, 2015-Ohio-4741, ¶ 21 (12th Dist.), citing *Eastley* at ¶ 20. A judgment will not be reversed as being against the manifest weight of the evidence where the "judgment is supported by some competent, credible evidence going to all essential elements of the case." *Ashburn v. Roth*, 2007-Ohio-2995, ¶ 26 (12th Dist.). In making this determination, an appellate court generally defers to the trier of fact on issues of credibility. *Frisby v. Solberg*, 2016-Ohio-7644, ¶ 8 (12th Dist.).

{¶ 89} "In Ohio, a covenant of quiet enjoyment is implied into every lease contract for realty." *Hamilton Brownfields Redevelopment, LLC v. Duro Tire & Wheel*, 2004-Ohio-

1365, ¶ 23 (12th Dist.), citing *Dworkin v. Paley*, 93 Ohio App.3d 383, 386 (8th Dist. 1994). "Such covenant protects the tenant's right to a peaceful and undisturbed enjoyment of his leasehold." *Id.* "The covenant is breached when the landlord obstructs, interferes with, or takes away from the tenant in a substantial degree the beneficial use of the leasehold." *Id.* "The degree of the impairment required is a question for the finder of fact." *Id.* "When the landlord breaches the covenant of quiet enjoyment, the tenant is relieved of its obligation to pay rent for the premises." *Id.*

{¶ 90} We find that competent and credible evidence supported the trial court's finding that Neyer Holding did not breach Hunt's quiet enjoyment of the premises. Hunt and her witnesses testified that the roof leaked throughout their tenancy and caused numerous water intrusion events. But the evidence was clear that Hunt informed Neyer Holding of these issues and that Neyer Holding responded, either by dispatching one of its maintenance workers to address the issue, or, in the event of some leak that was beyond their capability, by dispatching a roofing contractor.

{¶ 91} During the time Hunt was experiencing these water intrusion issues, she twice extended the lease and expanded her footprint in the building. In the first lease amendment, Hunt accepted the property "as is" but specifically requested Neyer Holding address two issues with the building: the operation of the HVAC system and maintenance to the blacktop. She made no mention of the roof issue. And in the second lease amendment, there was no mention of any conditions that Hunt wanted Neyer Holding to correct. The two extensions of the lease, without any mention of the roof leaking, suggest that the issues with the roof were not so significant as to substantially interfere with Hunt's business.

{¶ 92} The conclusion that the roof issue was not as dire as Hunt now describes is consistent with Bosch's testimony. Bosch was critical of the dripping water and standing

puddles of water in the back areas of the building. But she testified that she sent her clients to the premises regardless of these concerns, because the benefits of the product and people at the Cabinet & Granite Depot apparently outweighed those concerns.

{¶ 93} Finally, the record reflects that Hunt never provided Neyer Holding with any formal notice that she believed the roof condition constituted a default under the lease until she had decided to relocate and in fact purchased a new building. Thus, competent and credible evidence supported the trial court's determination that Hunt failed to establish that Neyer Holding substantially interfered with her enjoyment of the premises.

{¶ 94} We overrule Hunt's third assignment of error.

**E. Quantum Meruit Claim**

{¶ 95} Hunt's fourth assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING THE
OBJECTION OF QIAO HUNT THAT THE CABINET DID NOT
ADD VALUE TO THE PROPERTY OF NEYER HOLDINGS,
AND DENIED ITS CLAIM OF QUANTUM MERUIT.

{¶ 96} In support of this assignment of error, Hunt contends that the trial court erred by failing to find in her favor on her quantum meruit claim. She contends that her improvement to the property—a $30,000 electrical upgrade, which she claims brought the entire 1970s era building up to code—enriched Neyer Holding, and that under equitable principles, it would be unjust to allow Neyer Holding to receive the benefit of this electrical upgrade without payment.

{¶ 97} The magistrate and the trial court relied on Section 9 of the lease agreement in denying Hunt's claim under quantum meruit. That section provides, in relevant part:

All alterations, additions and improvements made by Lessee
shall become the property of Lessor upon the making thereof
and shall be surrendered to Lessor upon the expiration of this
Lease.

{¶ 98} Notably, Hunt does not refer to Section 9 in her appellate brief, much less

explain why that section should not dictate the result with respect to her quantum meruit claim. Instead, Hunt merely argues the fairness of the situation and contends the electrical upgrade improved the premises and thus she should be compensated for her efforts.

{¶ 99} We find Section 9 dispositive of the issue. The parties contracted that any improvements to the property would inure to Neyer Holding's benefit upon the expiration of the lease term. Hunt therefore would have been aware that she could not retain the value of any electrical improvements after her lease term or demand compensation from Neyer Holding for the same. Hunt made that electrical upgrade specifically for use with her business and this is not a situation where equity would override the explicit terms of a contract between two sophisticated parties.

{¶ 100} We overrule Hunt's fourth assignment of error.

### III. Conclusion

{¶ 101} Hunt has failed to demonstrate that the court erred in finding against her on her claims of breach of contract and quantum meruit. The court's award of consequential damages is incomplete without a finding concerning the foreseeability of the damages to Hunt and therefore the damage award of $82,075.86 for early capital expenditures is vacated and the matter is remanded for a foreseeability determination with respect to this damage claim. Otherwise, the damage award is affirmed.

{¶ 102} Judgment affirmed in part, reversed in part, and remanded.

HENDRICKSON and PIPER, JJ., concur.

# J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, reversed in part, and remanded for purposes of a determination of foreseeability of damages, as set forth in the above Opinion.  The judgment is in, all other respects, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 25% to appellant/cross-appellee and 75% to appellee/cross-appellant.


/s/ Robert A. Hendrickson, Presiding Judge


/s/ Robin N. Piper, Judge


/s/ Matthew R. Byrne, Judge