[Cite as *Certain Interested Underwriters at Lloyd's, London, England v. Total Quality Logistics, L.L.C.*, 2023-Ohio-4470.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |
|---|---|---|
| CERTAIN INTERESTED UNDERWRITERS AT LLOYD'S, LONDON, ENGLAND, et al., | : | |
|  | : | CASE NO. CA2023-01-002 |
| Appellants, | : | O P I N I O N<br>12/11/2023 |
|  | : | |
| - vs - | : | |
|  | : | |
| TOTAL QUALITY LOGISTICS, LLC, | : | |
| Appellee. | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2021 CVH 01022

The Ferris Law Group LLC, and David A. Ferris, for appellants.

Giles & Harper, LLC, and Brian T. Giles, for appellee.

**BYRNE, J.**

{¶ 1} Certain Interested Underwriters at Lloyd's, London, England ("Lloyd's") and Outlook Acquisition Corporation ("Outlook") (collectively, "Plaintiffs") appeal the decision of the Clermont County Court of Common Pleas, which granted Total Quality Logistics, LLC's ("TQL") motion for summary judgment and dismissed Plaintiffs' sole cause of action for breach of contract against TQL. For the reasons discussed below, we affirm the common

pleas court's decision.

## I. Procedural and Factual Background

{¶ 2}  TQL is a freight broker.  TQL arranges for the transportation of its clients' freight using independent, third-party motor carriers.  At the time of the relevant events of this case, Outlook was a TQL client and used TQL's freight brokerage services.  Lloyd's was Outlook's insurer for property loss.

{¶ 3}  Prior to Outlook using TQL's brokerage services, TQL and Outlook entered into a written agreement ("Agreement").  The Agreement, which was prepared by TQL, is titled "Account Application" and refers to Outlook as "Company."  It contains twelve paragraphs of "Terms and Conditions," of which three paragraphs are relevant to this appeal:

> 8.  Company understands that TQL is a transportation broker only who arranges the transportation of freight by an independent third party motor carrier.  Company agrees that TQL will not fill out Bills of Lading and cannot be listed on Bills of Lading as the delivering carrier.

> 9.  In the event of cargo loss or damage, Company must file a claim for the loss with TQL within nine (9) months from the date of such loss, shortage or damage, which for purposes of this Agreement shall be the delivery date or, in the event of non-delivery, the scheduled delivery date.  Company agrees to assist TQL in the pursuit of a claim, including confirming the validity of the claim and claim amount.  If TQL pays a claim, company automatically assigns any and all of its rights and interest in the claim to TQL.

> 10.  Company understands motor carriers under contract with TQL are required to maintain cargo loss and damage liability insurance in the amount of $100,000.00 per shipment.  By signing below, Company acknowledges that loads valued in excess of $100,000.00 will not be tendered without first giving written notice to allow TQL and/or the contracted motor carrier the opportunity to arrange for increased insurance limits. Failure to provide written notice will result in your loads not being insured to the extent the value exceeds $100,000.00.

{¶ 4}  In 2019, Outlook used TQL's brokerage services in conjunction with a load of

electronics that Outlook needed to be transported from Miami, Florida to Edison, New Jersey. TQL arranged for this cargo to be transported by "Safe Connection," a motor carrier. But the shipment did not go well; Outlook's electronics were stolen while being transported by Safe Connection. Lloyd's thereafter paid Outlook for the property loss. Outlook and Lloyd's then demanded payment from TQL for the stolen cargo. TQL did not pay the loss claim.[1]

{¶ 5} In 2021, Outlook and Lloyd's filed a complaint in the Clermont County Court of Common Pleas against TQL, asserting a single cause of action for breach of contract. In the complaint, Plaintiffs averred that TQL breached the Agreement by (1) failing to arrange for transportation and delivery of the shipment "by a motor carrier authorized to perform the transportation at issue," (2) failing to contract "with a motor carrier maintaining cargo loss and damage liability insurance," (3) failing "to adequately arrange for delivery" of the electronics shipment to New Jersey as designated by Outlook, and (4) failing "to pay the Claim amount" to Outlook.

{¶ 6} TQL moved for summary judgment. First, TQL argued that Plaintiffs' claims were preempted by a federal statute, the Carmack Amendment, 49 U.S.C. 14501, et seq. Plaintiffs of course argued that their claims were not preempted. The trial court agreed with Plaintiffs' arguments and found TQL's preemption argument to be meritless.[2] Second, TQL argued that there were no material facts in dispute and that Plaintiffs' four arguments asserted in the complaint as to how TQL purportedly committed breach of contract were unsupported by any language in the Agreement. TQL argued that the only Agreement language that might relate to Plaintiffs' claim of breach were Paragraphs 8, 9, and 10.

---

1. In its brief, TQL notes that Plaintiffs initially sued TQL and Safe Connection in a Florida county circuit court. TQL asserts that it was dismissed from that case after filing a motion to dismiss and that Plaintiffs obtained a default judgment against Safe Connection in the amount of $332,145.55.

2. TQL did not cross-appeal the denial of its Carmack Amendment preemption arguments.

However, TQL argued that these paragraphs did not impose any duties or obligations on TQL, and therefore, it did not breach the Agreement as a matter of law. Plaintiffs presented arguments in opposition to summary judgment, which arguments will be addressed in more detail below.

{¶ 7} The trial court analyzed the paragraphs of the Agreement in light of both TQL's and Plaintiffs' arguments. We will address the specifics of the court's reasoning further below. For now, we note that the court ultimately concluded:

> Here, the language in the Agreement does not evince an intent of the parties to impose the duties on TQL that the plaintiffs allege TQL breached. The particular provisions at issue do not use language typical for imposing duties in conjunction with TQL (e.g. must, shall, will, etc.). Further, the language does not state that TQL "guarantees" or "affirms" certain information as true (e.g. that motor carriers are authorized or insured, that TQL shall pursue and pay a claim, etc.). To find that TQL breached the contract, the court would have to impose terms in the Agreement that the parties did not. On the whole, the court cannot find that TQL breached the Agreement in the capacities that the plaintiffs allege.

Accordingly, the trial court granted TQL's motion for summary judgment and dismissed the complaint.

{¶ 8} Plaintiffs appealed, raising one assignment of error.

## II. Law and Analysis

{¶ 9} The Plaintiffs' assignment of error states:

{¶ 10} THE TRIAL COURT ERRED BY GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT.

{¶ 11} Plaintiffs argue that the trial court erred in granting summary judgment because the court (1) ignored material facts in dispute; (2) improperly relied upon the dictionary definition of "broker," as opposed to the definition of "broker" found in a federal regulation, 49 C.F.R. 371.2(a); (3) incorrectly found that language in the Agreement did not impose an obligation on TQL to select a motor carrier with loss and damage liability

insurance; and (4) incorrectly found that the Agreement did not impose an obligation on TQL to "take the lead" on investigating Outlook's loss claim and to pay that claim. We will analyze these arguments after addressing the applicable law and standard of review.

## A. Applicable Law: Breach of Contract Claim

{¶ 12} "In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which we presume rests in the language that they have chosen to employ." *In re All Kelley & Ferraro Asbestos Cases*, 104 Ohio St.3d 605, 2004-Ohio-7104, ¶ 29. "Where the terms of the contract are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties." *State ex rel. Lee v. Plain City*, 12th Dist. Madison No. CA2017-01-002, 2017-Ohio-8931, ¶ 21, citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989). That is to say, "[a] contract that is, by its terms, clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract." *Cooper v. Chateau Estate Homes, L.L.C.*, 12th Dist. Warren No. CA2010-07-061, 2010-Ohio-5186, ¶ 12.

{¶ 13} This court reviews issues of contract interpretation de novo. *Pierce Point Cinema 10, L.L.C. v. Perin-Tyler Family Found., L.L.C.*, 12th Dist. Clermont No. CA2012-02-014, 2012-Ohio-5008, ¶ 10.

## B. Applicable Law: Summary Judgment

{¶ 14} Summary judgment is appropriate under Civ.R. 56 when (1) there is no genuine issue of material fact remaining to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in its favor. *BAC Home Loans Servicing, L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 17 (12th Dist.), citing *Zivich v. Mentor Soccer Club, Inc.*, 82

Ohio St.3d 367, 369-370 (1998).

{¶ 15} The party requesting summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Once a party moving for summary judgment has satisfied its initial burden, the nonmoving party "must then rebut the moving party's evidence with specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in its pleadings." *Deutsche Bank Natl. Trust Co. v. Sexton*, 12th Dist. Butler No. CA2009-11-288, 2010-Ohio-4802, ¶ 7; Civ.R. 56(E).

{¶ 16} This court reviews a trial court's summary judgment decision under a de novo standard. *Sexton* at ¶ 7.

### C. Analysis

### 1. Arranging for an "Authorized Motor Carrier"

{¶ 17} Plaintiffs alleged in their complaint that TQL breached the Agreement by "fail[ing] to arrange for transportation by a motor carrier authorized to perform the transportation at issue * * *." TQL argued in its motion for summary judgment that the Agreement imposed no such obligation on TQL. In response, Plaintiffs argued that Paragraph 8 of the Agreement used the word "broker" pursuant to the definition of that word in a federal regulation, 49 C.F.R. 371.2(a). That regulation defines "broker" as "a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier."[3] 49 C.F.R. 371.2(a). The trial court agreed with TQL and rejected Plaintiffs' reliance on the federal regulation. The court found that Paragraph 8 did not require TQL to select an "authorized motor carrier." In so finding, the court rejected

---

3. 49 C.F.R. 371.2(a) is part of the Federal Motor Carrier Safety Regulations.

Plaintiffs' reliance on the definition of "broker" in 49 C.F.R. 371.2(a) and instead relied on a dictionary definition of "broker." The court reasoned that the dictionary definition provided the proper method of determining the meaning of "broker" as used in Paragraph 8 because "courts use the plain and ordinary meaning of the language in a contract unless a different meaning 'is clearly apparent' from the contract[,]" and Paragraph 8 did not refer to 49 C.F.R. 371.2(a) so "it is not 'clearly apparent' from the language in the Agreement that broker has a different meaning than its ordinary meaning." (MSJ Decision at 9, citing *Sunoco, Inc. [R&M] v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, ¶ 37.)

{¶ 18} On appeal, Plaintiffs argue the trial court erred in its analysis and that TQL breached the Agreement by failing to arrange for an "authorized motor carrier" to transport Outlook's cargo.

{¶ 19} Our analysis begins with the text of the Agreement. Paragraph 8 of the Agreement states:

> Company understands that TQL is a transportation *broker* only who arranges the transportation of freight by an independent third party motor carrier. Company agrees that TQL will not fill out Bills of Lading and cannot be listed on Bills of Lading as the delivering carrier.

(Emphasis added.) Based on a plain reading of Paragraph 8, we conclude that the Agreement did not obligate TQL to provide Outlook with an "authorized motor carrier." There is no language in Paragraph 8 referring to an "authorized motor carrier." Beyond that, Paragraph 8 imposed no obligations, whatsoever, on TQL. Instead, the purpose of Paragraph 8 was to inform Outlook of TQL's role in the freight brokerage transaction. That is, the purpose of Paragraph 8 was to inform Outlook that TQL is only the freight *broker* in the transaction, is not the transportation *carrier*, and cannot be listed as such on the bill of lading. Thus, the only party potentially accepting any obligations under Paragraph 8 was Outlook, which, by signing the Agreement, acknowledged that it "understands" that TQL is

a "transportation broker only" and "agrees" that TQL will not "fill out" bills of lading and cannot be listed on the bill of lading as the delivering carrier.

{¶ 20} Despite this unambiguous language, Plaintiffs assert that we should interpret the language of Paragraph 8 as having required TQL to arrange for an "authorized motor carrier" based on the definition of "broker" in 49 C.F.R. 371.2(a). Plaintiffs note that under this regulation, a federally-licensed "broker" in interstate commerce is defined as "one who hires authorized motor carriers" and who is required to keep records on federally issued registration numbers for the motor carriers it uses. Plaintiffs argue that for TQL to "lawfully perform its obligations under the [Agreement], TQL must be licensed and must use authorized motor carriers to transport freight." (Brief at page 4.) Plaintiffs contend that "TQL's hiring of an unauthorized motor carrier and facilitating transportation of the Freight in interstate commerce by that carrier would have been, if proven at trial, a violation of applicable law." *Id*. at page 5. Plaintiffs then argue that Paragraph 8 must be interpreted in accord with 49 C.F.R. 371.2(a) because courts are to adopt interpretations of contracts that render their terms valid and to give effect to the obligations of the parties, rather than adopt interpretations of contracts that are invalid and ineffectual.

{¶ 21} Plaintiffs' argument fails. The text of the Agreement does not define "broker" with any reference to 49 C.F.R. 371.2(a). As discussed above, where the terms of the contract are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties. *Plain City*, 2017-Ohio-8931 at ¶ 21. In its decision, the trial court correctly noted that courts use the plain and ordinary meaning of language in a contract unless a different meaning is "clearly apparent" from the contract. *Sunoco*, 2011-Ohio-2720 at ¶ 37. It is not "clearly apparent" from the text of the Agreement that the parties intended to incorporate the 49 C.F.R. 371.2(a) definition of "broker." Therefore, the trial court did not err when it interpreted "broker" based

on a dictionary definition of that term, which definition did not include the "authorized motor carrier" language.

{¶ 22} Plaintiffs' argument that we should interpret the Agreement to include the "authorized motor carrier" requirement of 49 C.F.R. 371.2(a) because not doing so would result in allegedly illegal conduct by TQL also fails. Plaintiffs cite *Great N. RR. Co. v. Delmar Co.*, 283 U.S. 686, 51 S.Ct. 579 (1931), for the proposition that "where two constructions of a written contract are possible, preference will be given to that which does not result in violation of law." *Id*. at 691. This argument is a red herring. Whether TQL might subject itself to some penalty under federal law or regulation in the manner it conducts business has no effect on the *legal* issue of the interpretation of the Agreement and specifically whether TQL agreed to an obligation it did not keep. As discussed above, the plain language of the Agreement did not impose any obligation on TQL, much less the obligation of hiring an "authorized motor carrier." Paragraph 8 identified TQL as a "broker" but did not define that term under any applicable federal law or regulation. The interpretation of the Agreement called for by Plaintiffs is not "possible" given the text of Paragraph 8 and therefore no further interpretation of the contract is necessary. *See Delmar* at 691.

{¶ 23} For these reasons, even if we construe the evidence most strongly in Plaintiffs' favor and assume that Safe Connection was not an "authorized motor carrier," Plaintiffs could not prove, as a matter of law, that TQL breached the Agreement by failing to arrange for an "authorized motor carrier."

**2. Arranging for Insurance**

{¶ 24} Plaintiffs alleged in their complaint that TQL breached the Agreement by "fail[ing] to contract with a motor carrier maintaining cargo loss and damage liability insurance * * *." Again, TQL argued in its motion for summary judgment that the Agreement imposed no such obligation on TQL. In response, Plaintiffs argued that Paragraph 10 of

the Agreement required TQL to only select carriers with a certain level of cargo loss and damage liability coverage. The trial court agreed with TQL and rejected Plaintiffs' characterization of Paragraph 10. The court reasoned that Paragraph 10 did not impose an obligation on TQL to obtain insurance coverage and also did not impose any obligations on TQL.

{¶ 25} On appeal, Plaintiffs argue the trial court erred in its analysis because Paragraph 10 states that "motor carriers under contract with TQL *are required* to maintain cargo loss and damage liability insurance in the amount of $100,000.00 per shipment." (Emphasis added.) They also argue that because Paragraph 10 says that "'Company understands' this obligation on the part of TQL," there was a meeting of the minds between Outlook and TQL on this matter.

{¶ 26} Our analysis again begins with the text of Paragraph 10 of the Agreement:

> Company understands motor carriers under contract with TQL are required to maintain cargo loss and damage liability insurance in the amount of $100,000.00 per shipment. By signing below, Company acknowledges that loads valued in excess of $100,000.00 will not be tendered without first giving written notice to allow TQL and/or the contracted motor carrier the opportunity to arrange for increased insurance limits. Failure to provide written notice will result in your loads not being insured to the extent the value exceeds $100,000.00.

We find that the plain language of Paragraph 10 did not impose any contractual duties on TQL and specifically did not impose an obligation on TQL to "contract with a motor carrier maintaining cargo loss and damage liability insurance * * *." The first portion of the first sentence of Paragraph 10 begins with "Company understands." This language indicates that the focus of Paragraph 10 is on the Company's (Outlook's) obligations, not TQL. The remainder of the sentence is explanatory in nature and describes TQL's contractual relations with its third-party independent carriers.

{¶ 27} The remainder of the first sentence of Paragraph 10 does suggest that TQL

behaves in a certain way (requiring its motor carriers to obtain a minimum $100,000 of insurance). However, there is no language in the first sentence of Paragraph 10 that could be reasonably interpreted to impose a duty or obligation on TQL with respect to the procurement of insurance. For instance, Paragraph 10's first sentence does not state that TQL will, shall, or must ensure that its motor carriers delivering its client's cargo obtain sufficient insurance for purposes of the Agreement. Nor does the first sentence state that TQL guarantees or promises that its motor carriers have a minimum level of insurance.

{¶ 28} Paragraph 10's second and third sentences underscore this interpretation of the first sentence. Specifically, the second and third sentences imposed obligations on Outlook to inform TQL of cargo valued over $100,000 and explained why TQL required this information. The first sentence, explanatory in nature, provides context for Outlook's obligations set forth in the final two sentences.

{¶ 29} Read holistically, the purpose of Paragraph 10 is to ensure that Outlook informed TQL in writing if the value of its freight exceeded the minimum $100,000 in loss coverage that TQL requires its motor carriers to obtain. This is to ensure that TQL or its motor carriers had "the opportunity" to obtain increased insurance in the case of freight worth more than that minimum insured amount. Moreover, the use of the phrase "the opportunity," suggests that whether TQL or its motor carriers decide to procure additional insurance is a matter left to their discretion.

{¶ 30} While Paragraph 10 informs Outlook that TQL requires its motor carriers to maintain a minimum amount of insurance, this is a reference to a separate contract between TQL and its motor carriers ("motor carriers under contract with TQL"). Plaintiffs have never claimed to be a party to those separate contracts. And, as noted by the trial court in its decision, Plaintiffs have never argued that Outlook was a third-party beneficiary of any contract between TQL and Safe Connection.

{¶ 31} Like Paragraph 8, the only party undertaking any obligation or promise in Paragraph 10 was Outlook. Outlook agreed to its "understanding" of TQL's separate contractual relationships with its motor carriers and further agreed to inform TQL if the value of its cargo exceeded $100,000. On the other hand, TQL undertook no responsibilities under the plain language of Paragraph 10.

{¶ 32} For these reasons, even if we construe the evidence most strongly in Plaintiffs' favor and assume that Safe Connection did not have appropriate insurance, Plaintiffs could not prove, as a matter of law, that TQL breached the Agreement by failing to contract with a motor carrier maintaining cargo loss and damage liability insurance.

### 3. Failure to Pay the Loss Claim

{¶ 33} Plaintiffs alleged in their complaint that TQL breached the Agreement by "fail[ing] to pay the Claim amount to [Outlook]." TQL argued in its motion for summary judgment that there was no language in the Agreement requiring TQL to pay Outlook for its loss claim. TQL also pointed out that by using the phrase "*If* TQL pays a claim," Paragraph 9 of the Agreement indicated that it had the option of paying or not paying a particular loss claim. In opposition to summary judgment, Plaintiffs argued that TQL did not pursue the claim against Safe Connection, and in effect abandoned the loss claim, preventing Outlook from being able to recover after Safe Connection ceased being a viable, operating company. The trial court, as it did with Paragraph 8 and 10, agreed with TQL and concluded that Paragraph 9 did not impose any obligations on TQL.

{¶ 34} On appeal, Plaintiffs argue that Outlook satisfied its obligations under Paragraph 9 by "assisting" TQL in pursuing the loss claim, but that TQL did not satisfy its obligations under Paragraph 9 because it failed to pursue and pay the claim.

{¶ 35} Paragraph 9 of the Agreement provides,

> In the event of cargo loss or damage, Company must file a claim

for the loss with TQL within nine (9) months from the date of such loss, shortage or damage, which for purposes of this Agreement shall be the delivery date or, in the event of non-delivery, the scheduled delivery date. Company agrees to assist TQL in the pursuit of a claim, including confirming the validity of the claim and claim amount. If TQL pays a claim, company automatically assigns any and all of its rights and interest in the claim to TQL.

In their brief, Plaintiffs admit that Paragraph 9 "does not expressly state that TQL will take the lead on an investigation and pay claims * * *." But Plaintiffs argue that the Agreement required Outlook to "assist" TQL in the pursuit of a claim. And by agreeing to assist TQL, Plaintiffs argue that this language "confirms TQL was to take the lead on investigating loss of the Freight and paying the claim if found to be viable."

{¶ 36} We disagree with Plaintiffs' interpretation of this language. Like the language in Paragraphs 8 and 10, the only party that obligated itself or made any promises in Paragraph 9 was Outlook. Outlook agreed to (1) file any loss claim with TQL within a defined period, (2) assist TQL in the pursuit of the claim, and (3) *if* TQL paid a claim, then Outlook agreed to assign any rights it may have to TQL. Thus, all obligations were on Outlook, not TQL. Furthermore, by using the word "*if,"* it is evident that TQL did not contractually agree to pay all claims presented to it under Paragraph 9.

{¶ 37} Alternatively, Plaintiffs argue that if Paragraph 9 is found by this court to be ambiguous, then an issue of fact exists which should have precluded summary judgment. However, we do not find Paragraph 9 to be ambiguous.

{¶ 38} For these reasons, even if we construe the evidence most strongly in Plaintiffs' favor, Plaintiffs could not prove, as a matter of law, that TQL breached the Agreement by failing to pay Outlook's loss claim.

### 4. "Ignoring" Genuine Issues of Fact

{¶ 39} Finally, Plaintiffs assert that the trial court ignored various genuine issues of

material fact that precluded summary judgment under Civ.R. 56(C). Plaintiffs specifically asserts that the following genuine issues of material fact precluded summary judgment: (1) "whether Safe Connection was an authorized motor carrier and whether it maintained requisite authority from the Federal Motor Carrier Safety Administration[,]" (2) "whether Safe Connection maintained cargo loss or damage liability insurance[,]" and (3) "whether TQL breached its own requirements, as set forth in the [Agreement], for submittal, investigation, and payment of cargo claims."

{¶ 40} It is true that all of these factual allegations made by Plaintiffs are disputed by TQL. For example, TQL asserts that Safe Connection was an authorized motor carrier and that Safe Connection did maintain appropriate insurance. But the question before us is not whether these factual issues are disputed, but whether these disputes involve "material" facts. *Gosser v. Warren Cty. Engineer's Office*, 12th Dist. Warren No. CA2022-02-007, 2023-Ohio-2439, ¶ 25-26; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986) (stating that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").

{¶ 41} Regarding whether Safe Connection was an authorized motor carrier, this is not a *material* fact for the reasons stated above. The Agreement imposed no obligation on TQL to arrange for an "authorized motor carrier." Whether Safe Connection maintained adequate insurance is also not a *material* fact for the reasons stated previously. No term of the Agreement imposed a duty or obligation upon TQL to contract with motor carriers having cargo loss and damage liability insurance.

{¶ 42} Finally, concerning whether TQL breached its obligations to investigate and pay claims, this is also not a *material* fact and is simply Plaintiffs' attempt to reargue that Paragraph 9 imposed an obligation upon TQL to pay its loss claim. As described above, TQL had no obligation under Paragraph 9 of the Agreement to perform any acts related to

the handling of loss claims. Instead, all obligations in Paragraph 9 were placed upon Outlook.

{¶ 43} Plaintiffs have failed to point to any genuine issues of material fact that should have precluded a grant of summary judgment.

### III. Conclusion

{¶ 44} Plaintiffs have failed to establish that the common pleas court erred in granting summary judgment in favor of TQL. Plaintiffs have failed to point to any legal or factual basis for their claim that TQL breached the Agreement. We overrule Plaintiffs' sole assignment of error.

{¶ 45} Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.