[Cite as *Marks v. Welch*, 2025-Ohio-5362.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |
|---|---|---|
| MICHAEL MARKS, | : | |
| Appellant, | : | CASE NO. CA2024-06-010 |
| | : | |
| - vs - | : | OPINION AND JUDGMENT ENTRY 12/1/2025 |
| | : | |
| SKYE M. WELCH, | : | |
| Appellee. | : | |

CIVIL APPEAL FROM CLINTON COUNTY MUNICIPAL COURT
Case No. CVE 2200104

Benson & Sesser, LLC, and Mark D. Tolles, II and Sarah A. Kuntz, for appellant.

Shawn M. Blatt, for appellee.

# **O P I N I O N**

**BYRNE, P.J.**

{¶ 1} Michael E. Marks appeals from the decision of the Clinton County Municipal Court on his civil complaint for damages resulting from an automobile collision. For the reasons described below, we affirm the trial court's decision.

## I. Factual and Procedural Background

### A. The Accident and Vehicle Repair

{¶ 2}   In December 2020, Marks purchased a new 2020 Hyundai Elantra SE automobile for $20,550. The vehicle had 76 miles on the odometer at the time of the purchase.

{¶ 3}   On January 20, 2021, Marks was driving the Elantra in Wilmington, Ohio when it was hit from behind by a vehicle driven by Skye M. Welch. The record is undisputed that Welch failed to maintain an assured clear distance between her vehicle and the Elantra, and that Welch was responsible for the accident.

{¶ 4}   The accident occurred at low speeds and was minor. Essentially, the Elantra's bumper suffered minor cosmetic damage. Police responded and took an accident report. Marks was able to drive the vehicle away from the accident. The record reflects that the Elantra's mileage was approximately 3,000 on the date of the accident.[1]

{¶ 5}   Marks continued driving the unrepaired Elantra for several months. In May 2021, Marks had the Elantra repaired at a collision center. The repair involved replacement of the bumper and "lower cover," painting, and certain costs related to installation. The repair cost totaled $1,828.50. Marks paid out of pocket for the repairs, apparently due to difficulties in dealing with Welch's insurance company.

{¶ 6}   During the time the Elantra was being repaired, Marks rented a vehicle. He paid, out of pocket, $464.45 in rental fees.

### B. Complaint and Release of Claims

{¶ 7}   In March 2022, Marks filed a complaint against Welch in the Clinton County Municipal Court, asserting three claims for negligence, titled "negligence/personal injury,"

---

1. Marks worked as a courier and used the Elantra for this work, which explains the significant mileage gained on the vehicle in the roughly six weeks between the purchase date and accident date.

"negligence/property damage," and "negligence per se." Relevant to this appeal, Marks requested that the court award him compensatory damages for bodily harm, for damages related to the repair of the Elantra, for damages relating to the loss of use of the Elantra, and for pre- and post-judgment interest.

{¶ 8} In January 2023, Marks signed a "Full Release of All Claims with Indemnity" ("the Release"). In return for payment of $2,500, Marks agreed to broadly release Welch from:

> any and all claims, actions, causes of actions, demands, rights, damages, costs, loss of wages, expenses, hospital and medical expenses, loss of consortium, loss of service, any and all claims for interest accruing on the settlement, including, without limitation, all claims for interest pursuant to Ohio Revised Code 1343.03 and any compensation whatsoever, which the undersigned now has/have or which may hereafter accrue on account of or in any way growing out of an accident which occurred on or about 1/20/2021 at or near Main St, Wilmington OH.

{¶ 9} Apparently, the parties intended for the Release to only apply to Marks' claims for bodily injury and did not intend for the Release to apply to his property damage claims, though this is not specified in writing anywhere on the Release. Regardless, the parties proceeded as if the Release was restricted to Mark's bodily injury claims and the matter proceeded to a trial on other contested issues.

### C. Pretrial Stipulations

{¶ 10} Before trial, Marks and Welch stipulated that Marks was entitled to damages for the Elantra repair in the amount Marks paid to the collision center ($1,828.50) as well as reimbursement for his rental expenses in the amount Marks paid to the car rental company ($464.45). The issues the parties identified as remaining for trial (which are relevant to this appeal) were Welch's claim for residual diminished value (essentially, the loss in value to his vehicle due to it being in an accident and having been repaired) and

- 3 -

his claim for lost wages while the vehicle was being repaired and while he attended his deposition and court dates.

## D. The Trial

### 1. Marks' Case

#### a. Marks' Testimony

{¶ 11} Marks testified about purchasing the Elantra, the price he paid, and the costs associated with the Elantra's repair. Marks testified that he bought the Elantra because the Hyundai brand retained its value and his plan was to trade the Elantra in for another vehicle after it reached a certain mileage. Marks testified that he was claiming damages for lost wages associated with a three-day period when he was unable to use his rental car to make courier deliveries and when he had to appear at his deposition and court dates. On cross-examination, Marks agreed that he signed the Release and that he signed it upon the recommendation of counsel.

#### b. Josh Roberts' Testimony

{¶ 12} Josh Roberts testified that he was a licensed auctioneer and real estate salesperson/broker in Ohio. He worked for a company that specialized in liquidating estates and businesses and also operated an automobile auction. In his work, he routinely provided opinions as to the value of vehicles in estates. The court recognized Roberts as an expert. However, the court did not specify in what area it found Roberts qualified as an expert. Presumably the court recognized Robert as an expert in the valuation of automobiles.

{¶ 13} Roberts testified that he reviewed information concerning the Elantra, including photographs, the title, the VIN number, estimated mileage on the date of the accident, and the fact that the car had been recently purchased prior to the accident.

{¶ 14} Roberts explained his methodology of arriving at his opinion, which was

reviewing online vehicle sales, Kelley Blue Book, and Edmunds NADA car values.

{¶ 15} Roberts testified that in his opinion and based on his internet research, the Elantra, before the collision, was valued between $17,500 and $19,000 in a "retail setting." For a trade-in value, Roberts found ranges between $15,000 to $17,000. From these trade-in values, Roberts used the amount of $15,433 as a "placeholder" because the vehicle had been in an accident but was in "fair" condition even after the accident. Roberts explained the next part of his analysis:

> At that time then we took off the repair estimate. We also took off furthering the repair estimate [sic], we took off the time, the -- the monetary investment that you would have had in the car, what you would have felt like the car would have needed to bring in excess thereof in order to make the vehicle worth the time of repairing the vehicle.
>
> Those expenses, and that's where the on top [sic] of the repair estimate, the diminished value came up to right around $3,500 in that repair estimate, on top of the repair estimate. So off of the 15,433, there was roughly $5,200 there, and we came up with somewhere in the neighborhood of $10,750, I believe, in the report of what that vehicle would have been worth after the accident.[2]

{¶ 16} Marks' counsel asked Roberts whether he agreed that the difference between $15,433 and $10,750 would be "what you would consider the diminished value." Roberts responded, "Yes, including the repairs." However, Roberts never testified to a specific value he considered to be the residual diminished value.

## 2. Defense Case – George Thielen's Testimony

{¶ 17} George Thielen testified that he was an "independent automotive consultant" and had been in the automative repair and sales business for 20 years. He stated that his area of expertise was establishing diminished value in motor vehicles. The

---

2. Roberts' report stated that the value of the vehicle after the accident, but unrepaired, could range between $9,500 to $12,000 with "a closer estimate being $10,750." Roberts' report did not explain his methodology of arriving at the $10,750. Instead, he explained this methodology in this quoted testimony.

court recognized Theilen as an expert.

{¶ 18} Theilen testified generally about diminished value and noted that whether a car in a minor accident suffers diminished value largely depends on the vehicle model. He had observed that buyers of economy vehicles, like the Elantra, Toyota Camry, or Honda Accord, would not be concerned with buying a vehicle with a minor accident history. However, more expensive vehicles, such as Porsches or Ferraris, could lose significantly more value after being in minor accidents.

{¶ 19} Theilen reviewed photographs of the Elantra following the accident. He described the damage as "minor and typical." And he agreed with the characterization that the damage was "cosmetic."

{¶ 20} Theilen conducted his analysis of the diminished value of the Elantra in the summer of 2023, which was when he produced his written report. Theilen's estimation of diminished value was based upon comparable vehicles in dealer inventory at that time.

{¶ 21} Theilen described his methodology for establishing the Elantra's diminished value. He used software that allowed him to view vehicle inventory throughout the country. He searched for vehicles in the same geographic area and reviewed "Carfax" reports for each vehicle in order to find comparable vehicles with or without accident histories.

{¶ 22} Based on his analysis, Theilen opined that the residual loss to the value of the Elantra, after being repaired, and as of the date of his report (in the summer of 2023), was $1,524.

{¶ 23} However, Theilen noted that at the time of the accident, some two years earlier, the used car market was "extremely tight" and that used cars could be sold in some instances for more than new cars. Theilen stated that he could not "prove it" but he believed that the actual residual loss would have been at least half of $1,524. Theilen

testified that he believed that the diminished value of the Elantra was "a very small number" because it was a "very small accident on a car that, quite frankly, the marketplace doesn't show a lot of sensitivity to a minor accident."

### E. The Trial Court's Decision

{¶ 24} The trial court issued a written decision denying Marks' claim for residual diminished value. The court found that Marks "failed to provide specific, non-speculative, value of the amount" of residual loss in the Elantra. The court noted that Marks had failed to provide the court with evidence of the value of the vehicle *after* it was repaired. The court further stated that it was "hesitant" to accept Robert's testimony that the vehicle was only worth $10,750 after being in such a minor accident. The court noted that the evidence showed that the damage to the Elantra was very minor and the repairs cost $1,828.50. The court found that "[w]ithout including the value of the vehicle after repair, the residual value alleged by [Marks] would be merely speculative.

{¶ 25} The court stated that it found Thielen's testimony that the damage from the vehicle was very minor, insignificant, and not unusual was credible. The court also found credible Thielen's testimony that this type of damage would only "slightly hurt" that value of the Elantra. The court referred to Thielen's testimony concerning the unusual used car marketplace that occurred during the COVID pandemic.

{¶ 26} Ultimately, the court found that, based on Marks' testimony, he had purchased the vehicle based on the Hyundai brand retaining its value for an eventual trade-in. The court noted that Marks claimed that he lost potential trade-in value for the vehicle, but the court found this claim entirely speculative. The court noted that in fact, Marks had continued driving the vehicle and had driven it for well over 200,000 miles and that he had received "greater than full value" for the vehicle. Accordingly, the court did not award Marks damages based on residual loss.

{¶ 27} As to his claims for lost wages, the court found that Marks had settled and released this claim based on the language in the Release. Thus, the court denied Marks' claim for lost wages.[3]

### F. Post-Trial Motion for Statutory Interest

{¶ 28} Following the trial court's decision, Marks moved the court for pre- and post-judgment interest and court costs. After briefing, the court denied Marks' request for statutory interest, citing language in the Release specifically releasing any and all claims for interest pursuant to R.C. 1343.03. The court also denied Marks' request for court costs, finding that Marks was not the "prevailing party" under Civ.R. 54(D). In this regard, the court noted that Marks had only been awarded stipulated damages.

{¶ 29} Marks appealed, and has raised three assignments of error.

### II. Law and Analysis

### A. Residual Diminished Value

{¶ 30} Marks' first assignment of error states:

> THE TRIAL COURT ERRED IN ITS MARCH 4, 2024 JUDGMENT ENTRY WHEN AWARDING $0.00 IN COMPENSATORY DAMAGES FOR THE RESIDUAL DIMINISHED VALUE OF APPELLANT'S MOTOR VEHICLE.

{¶ 31} Marks contends that the trial court erred in awarding no compensatory damages for the residual diminished value he claims to have lost due to the automobile accident. Marks argues that both experts testified that there was a residual diminished value loss associated with the accident and it was therefore error for the court to refuse to award any damages. Marks argues that the court's failure to award damages was an effective finding that he suffered $0.00 in damages and this conclusion is not supported

---

3. The court did order a judgment against Welch in the combined amount of $2,292.95, which was the amount stipulated by the parties for the repair work ($1828.50) and rental reimbursement ($464.45).

by the weight of the evidence. Marks also argues that the court erred in basing its decision on the concept that he received "greater than full value" of the vehicle by continuing to drive it for over 200,000 miles after the accident.

## 1. Standard of Review

{¶ 32} "The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case." *Skyward Learning Servs., Inc. v. Gray*, 2020-Ohio-1182, ¶ 10 (12th Dist.). *Accord Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. When considering a challenge to the manifest weight of the evidence, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered. *Hacker v. House*, 2015-Ohio-4741, ¶ 21 (12th Dist.), citing *Eastley* at ¶ 20. A judgment will not be reversed as being against the manifest weight of the evidence where the "judgment is supported by some competent, credible evidence going to all essential elements of the case." *Ashburn v. Roth*, 2007-Ohio-2995, ¶ 26 (12th Dist.). In making this determination, an appellate court generally defers to the trier of fact on issues of credibility. *Frisby v. Solberg*, 2016-Ohio-7644, ¶ 8 (12th Dist.).

## 2. Applicable Law

{¶ 33} In *Rakich v. Anthem Blue Cross & Blue Shield*, 2007-Ohio-3739 (10th Dist.), the Tenth District Court of Appeals discussed in detail the measure and elements of a property damage claim in the context of an automobile collision. The court first noted that the measure of damages in such a case is the same generally applicable to cases of property damage, i.e., that amount which will make the injured party whole. *Id*. at ¶ 8.

{¶ 34} The preferred calculation in automobile collision cases is the difference between the market value of the vehicle immediately before and immediately after the

collision. *Id*. at ¶ 9, citing *Falter v. Toledo*, 169 Ohio St. 238 (1959). This amount is known as the "gross diminution in value." *Id*. at ¶ 14.

{¶ 35} But the court also noted that an alternative method of calculating damages is available where an automobile in an accident is repaired. *Id*. In this method, the plaintiff may recover the cost of repairs in addition to the "difference between the market value of her automobile immediately before the accident and the market value of her vehicle immediately after its repair." *Id*. This difference in market value is referred to as "residual diminution in value." *Id*. at ¶ 14, 19. In any event, a damage calculation consisting of cost of repairs plus residual diminution in value may not exceed the value of gross diminution in value. *Id*. at ¶19.

### 3. Analysis

{¶ 36} Roberts did not testify as to the value of the vehicle after repairs. Instead, Roberts testified that the vehicle, in its unrepaired state, was valued at $10,750. From what we can glean from his testimony, he arrived at this figure by taking a trade-in value he found on the internet for the same car in "fair" condition ($15,433), then subtracting $3,500 and the cost of the repairs. From where or how Roberts derived the $3,500 figure is not clear. He described it as the "monetary investment that you would have had in the car, what you would have felt like the car would have needed to bring in excess thereof in order to make the vehicle worth the time of repairing." Parsing through these words, the $3,500 figure possibly represents an amount that Roberts felt would be necessary to compensate a vehicle owner for the inconveniences associated with an accident and repair. But this is not the method of calculating residual loss as set forth in *Rakich*, which is the difference in market value immediately before the accident and immediately after

the vehicle is repaired. [4]

{¶ 37} Welch's expert, Thielen, opined that the residual diminution in value of the Elantra was $1,524. He explained his methodology for arriving at this figure, which appeared consistent with the calculation methodology set forth in *Rakich*. That is, Thielen compared the market price differences between similar vehicles that had been in minor accidents to those with no accident histories. However, Thielen also explained that this amount was based on vehicle prices in the summer of 2023, some two years after the actual accident date. Thielen testified that due to the unusual used car market in 2021, the actual diminished value would be 50% less than his estimate in 2023.

{¶ 38} The trial court found that Thielen's testimony was more credible than Roberts' testimony and we defer to the factfinder on issues of credibility. *Frisby*, 2016-Ohio-7644 at ¶ 8. The trial court appeared to focus its decision on Thielen's testimony that this was a minor accident, and that such an accident would have a very minimal diminishing value effect on an economy sedan.

{¶ 39} Marks argues that the court erred by awarding no damages, even though Thielen opined that there was some diminished value loss associated with the accident. However, Thielen's calculation of diminished value was based on the value of the vehicle two years after the accident. Moreover, Thielen further qualified that his opinion as to diminished value would likely have been 50 percent less given the unusual used car market in existence at the time of the accident.

{¶ 40} The evidence presented did not convince the trial court that the Elantra had

---

4. To add yet another layer of complexity, Marks claims in his appellate brief that Roberts' opinion as to residual diminished value was $4,921.50. Roberts never testified to this figure. Instead, Marks calculates it himself by selectively citing portions of Roberts' testimony, including testimony concerning his valuation of the Elantra (1) before the accident; (2) after the accident but in an unrepaired state, and (3) testimony that he would include repair costs in some manner in that calculation. Suffice it to say, the record is very unclear as to what Roberts' actual opinion was on the calculation of residual diminished value. Regardless, these discrepancies are not important for purposes of our analysis.

suffered any residual loss in value after it was repaired. We believe that the record supports this conclusion. Roberts' testimony was confusing and was not helpful in determining a non-speculative after-repair value for the Elantra. Thielen's testimony established both that any residual loss would have been minimal and that his own estimate of residual loss was speculative. For these reasons, we find that the trial court's decision to award no residual loss damages was not against the manifest weight of the evidence.

{¶ 41} Marks also argues that the trial court erred in awarding no residual loss damages based on both parties stipulating that Marks was entitled to recover residual losses. However, the parties did not stipulate that Marks was entitled to residual loss damages. Instead, the parties stipulated:

> As a direct and proximate result of the January 20, 2021 collision, the market value of Plaintiff, Michael E. Marks', motor vehicle was diminished, although the parties disagree as to the extent of the diminution in value that his motor vehicle sustained due to the January 20, 2021 collision and whether such damages are recoverable under the specific facts and circumstances.

{¶ 42} Thus, the parties agreed that there was some diminution in value *after the accident*. But the stipulation said nothing about whether there was diminution in value after the vehicle had been repaired. But regardless of whether the parties agreed that there was some diminution in value, it was Marks' burden of proof to demonstrate such damages, and based on the above analysis, he failed to do so.

{¶ 43} Marks also argues that the court erred by observing that Marks had received "greater than full value" of the Elantra by continuing to drive it for over 200,000 miles after it was repaired. While Marks is correct that his use of the vehicle after its repair was not relevant to the question of diminished value, this fact does not establish that the court erred in concluding that Marks failed to present competent credible evidence of residual

diminished value. The court's commentary may have been irrelevant to the calculation of diminished value, but it does not establish that the court erred because competent and credible evidence supported the decision to award no damages. Therefore, we overrule Marks' first assignment of error.

### B. Claims for Lost Wages, Statutory Interest, and Court Costs

{¶ 44} We address Marks' second and third assignments of error collectively.

{¶ 45} Marks' second assignment of error states:

> THE TRIAL COURT ERRED IN ITS MARCH 4, 2024 JUDGMENT ENTRY WHEN AWARDING $0.00 IN COMPENSATORY DAMAGES FOR APPELLANT'S LOST WAGES ASSOCIATED WITH HIS MOTOR VEHICLE PROPERTY DAMAGE CLAIM.

{¶ 46} Marks' third assignment of error states:

> THE TRIAL COURT ERRED IN DENYING APPELLANT'S POST-TRIAL MOTION FOR ORDER AWARDING PRE-JUDGMENT INTEREST, POST-JUDGMENT INTEREST, AND COURT COSTS IN ITS APRIL 18, 2024 JUDGMENT ENTRY.

{¶ 47} Marks contends that the trial court erred by denying his claims for lost wages and pre- and post-interest judgment. As described above, the trial court found that Marks released these claims. Marks also contends that the trial court erred by not awarding him court costs. We will analyze these categories of damages separately.

### 1. Lost Wages and Statutory Interest

### a. Standard of Review

{¶ 48} The Release is a contract between Marks and Welch. Review and interpretation of contracts is subject to de novo review. *Certain Interested Underwriters at Lloyd's, London, England v. Total Quality Logistics, L.L.C.*, 2023-Ohio-4470, ¶ 13.

### b. Applicable Law

{¶ 49} "In construing the terms of a written contract, the primary objective is to give

- 13 -

effect to the intent of the parties, which we presume rests in the language that they have chosen to employ." *In re All Kelley & Ferraro Asbestos Cases*, 104 Ohio St.3d 605, 2004-Ohio-7104, ¶ 29. "Where the terms of the contract are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties." *State ex rel. Lee v. Plain City*, 2017-Ohio-8931, ¶ 21 (12th Dist.), citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989). That is to say, "[a] contract that is, by its terms, clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract." *Cooper v. Chateau Estate Homes, L.L.C.*, 2010-Ohio-5186, ¶ 12 (12th Dist.).

### c. Analysis

{¶ 50} In the Release, Marks released Welch from:

> any and all claims, actions, causes of actions, demands, rights, damages, costs, *loss of wages*, expenses, hospital and medical expenses, loss of consortium, loss of service, any and all claims for interest accruing on the settlement, including, without limitation, *all claims for interest pursuant to Ohio Revised Code 1343.03* and any compensation whatsoever, which the undersigned now has/have or which may hereafter accrue on account of or in any way growing out of an accident which occurred on or about 1/20/2021 at or near Main St, Wilmington OH.

(Emphasis added.)

{¶ 51} Based on a plain language review of the Release, Marks clearly and unambiguously released his claims against Welch for lost wages and pre- and post-judgment interest under R.C. 1343.03 "in any way growing out of an accident which occurred on or about 1/20/2021 at or near Main St, Wilmington OH." Therefore, the trial court did not err in concluding that Marks released Welch from these claims.

{¶ 52} In his appellate brief, Marks does not challenge the trial court's

interpretation of the Release language. In fact, Marks does not refer to the Release language whatsoever. Therefore, Marks impliedly concedes that the Release language, on its face, released these claims. Marks instead presents various non-textual arguments as to why the trial court should not have applied the Release to his claims for lost wages and statutory interest.

{¶ 53} Marks first argues that the parties, subjectively, believed that the Release only applied to Marks' bodily injury claims. He points out that although he signed the Release on February 21, 2023, Welch did not raise the Release as an affirmative defense in her Answer filed the next month. He also cites Welch's pretrial statement, in which she represented that the parties had settled the personal injury aspect of Marks' claim and that the remaining issues for trial were compensatory damages associated with the property damage claim. Finally, Marks cites the agreed stipulation of facts as demonstrating that Welch "did not believe that Mr. Marks' property damage claims as a whole were settled. . . ."

{¶ 54} We find this argument meritless. What the parties subjectively believed about the Release is irrelevant to the legal question of the effect of the document. The language of the document unambiguously released all claims for lost wages and statutory interest arising out of the accident. We therefore need not and may not resort to evidence outside of the Release to interpret its meaning. *Plain City*, 2017-Ohio-8931 at ¶ 21. Moreover, the examples cited above concerning Welch's pretrial statements or filings do not support the conclusion that Marks did not release these claims.

{¶ 55} Second, Marks presents an argument in the form of a question. He asks if the Release was as broad as interpreted by the trial court, then why did the court issue a compensatory damage award in the amount of $2,292.95? The answer is not difficult. The court issued a damage award presumably because the parties stipulated that Marks

was entitled to those damages. The trial court apparently did not consider the effect of the Release on Marks' entitlement to stipulated damages, likely because the parties never raised that issue with the trial court.

{¶ 56} Third, Marks argues "the only testimony at trial regarding the parties' prior settlement agreement was from Michael Marks, who confirmed that the prior settlement agreement applied only to his bodily injury claims." Marks does not develop this argument beyond this statement of fact. Apparently, Marks is arguing that because he testified about the applicability of the Release, his testimony was relevant to the interpretation of the Release. This argument is meritless. The interpretation of the Release was a legal issue for the court to decide and Marks' opinion about its applicability is irrelevant.

{¶ 57} Fourth, Marks argues that the "insurance industry treats bodily injury claims and property damage claims as separate claims and generally handles them independently of each other." Marks cites case law generally supportive of this concept. But the customs and practices of the insurance industry are irrelevant to the interpretation of unambiguous contract language. Marks could have altered the Release language to conform to the supposed industry standards but he did not do so.

{¶ 58} Fifth, Marks cites an Ohio Supreme Court case for the proposition that "loss of use of a vehicle for the reasonable time it takes to make repairs following a collision is recoverable as compensatory damages under a party's property damage claims." Marks does not develop this argument. We do not dispute that loss of use damages are available in automobile collision cases, but Marks expressly waived these damages through the Release. This final argument is therefore meritless.

**2. Court Costs**

{¶ 59} Marks next argues that the trial court erred in failing to award him court costs on the basis that he was not the "prevailing party" under Civ.R. 54(D). That rule provides

that "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs." Civ.R. 54(D).

{¶ 60} Based upon the language "unless the court otherwise directs," the Ohio Supreme Court held that a trial court has discretion to order that the prevailing party bear all or part of his or her own costs. *Vance v. Roedersheimer*, 64 Ohio St.3d 552, 555, 1992-Ohio-24. Accordingly, we review for an abuse of discretion, which occurs if the court's decision can be characterized as unreasonable, arbitrary, or unconscionable. *Ostigny v. Brubaker*, 2024-Ohio-384, ¶ 20 (12th Dist.).

{¶ 61} The trial court found that Marks was not the "prevailing party" because the only damage award he "won" at trial was the amount that the parties had stipulated prior to trial. We find this analysis reasonable. Marks did not "win" anything at trial other than stipulated damages. Marks did not prevail on any claim that was contested at trial. And even if Marks would properly be considered the prevailing party, the court had the discretion not to award him costs. We find no abuse of discretion.

{¶ 62} We overrule Marks' second and third assignments of error.

{¶ 63} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clinton County Municipal Court for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.


/s/ Matthew R. Byrne, Presiding Judge


/s/ Robin N. Piper, Judge


/s/ Mike Powell, Judge